SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. ELANA GORDON

 
 Docket:
 SJC-13735
 
 
 Dates:
 April 11, 2025 - September 17, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Controlled Substances. Constitutional Law, Confrontation of witnesses, Harmless error, Retroactivity of judicial holding. Practice, Criminal, Confrontation of witnesses, Witness, Hearsay, Harmless error, Retroactivity of judicial holding. Evidence, Expert opinion, Hearsay, Scientific test. Witness, Expert. Error, Harmless.
 
 

       Indictment found and returned in the
Superior Court Department on May 30, 2018.

      The case was tried before Thomas F.
McGuire, Jr., J.

      The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.

      Christopher DeMayo for the defendant.
      Arne Hantson, Assistant District Attorney,
for the Commonwealth.
      M. Chris Fabricant, of New York, Radha
Natarajan, & Stephanie Roberts Hartung, for New England Innocence
Project &
another, amici curiae, submitted a brief.
      R. Michael Cassidy, Benjamin K. Golden,
& Elizabeth N. Mulvey, pro se, amici curiae, submitted a brief.

      WENDLANDT, J.  In this case, we return to the intersection
of the accused's constitutional right to confront witnesses against her and the
prosecution's use of a substitute expert to present an ostensibly independent
opinion identifying a controlled substance; the original analyst, who alone
performed the testing, was no longer employed by the State police crime
laboratory (crime lab) at the time of trial. 
We are guided at this familiar post by the United States Supreme Court's
most recent decision regarding the accused's right of confrontation, Smith v.
Arizona, 602 U.S. 779 (2024).
      In the present case, the defendant, Elana
Gordon, was alleged to have passed Suboxone[1] to an inmate in a house of
correction in violation of G. L. c. 268, § 28, using her position as a lawyer
to feign that the sixty-one strips containing the controlled substance were
merely legal papers relating to the inmate's case.  As in Smith, a substitute expert gave an opinion
identifying the controlled substance. 
The substitute expert performed the technical and administrative reviews
of the original analyst's work, but as in Smith, the substitute expert neither
participated in nor observed the chemical testing performed by the
analyst.  As in Smith, the substitute
expert testified to the contents of the analyst's notes.  As in Smith, the analyst's out-of-court
statements provided support for the substitute expert's opinion only if the
analyst's statements were true.  And, as
in Smith, the substitute expert's opinion identifying the controlled substance
was not independent of the analyst's statements; in short, the proffered
opinion identifying the controlled substance, which the Commonwealth concedes
depended on the analyst's notes, "merely replicate[d], rather than somehow
buil[t] on, the testing analyst's conclusions."  Smith, 602 U.S. at 798-799.
      Applying Smith, we conclude that the
original analyst's statements set forth in her notes were out-of-court
statements admitted for their truth. 
Further concluding that the absent analyst's statements were testimonial
and that the admission of those statements, as well as the substitute expert's
opinion founded on the truth of the absent analyst's statements, was not
harmless beyond a reasonable doubt, we vacate the defendant's conviction.[2]
      1. 
Background.[3]  a.  Facts. 
As relevant to our analysis, in 2018 the defendant delivered two
envelopes containing sixty-one orange strips of an unidentified substance to an
inmate at the Plymouth County house of correction.  The exchange occurred the day following two
jail telephone calls with a first inmate, who instructed the defendant to
transmit the "paperwork" to a second inmate who would then pass it to
the first inmate.  Commonwealth v.
Gordon, 103 Mass. App. Ct. 1112 (2023) (unpublished), vacated and remanded, 145
S. Ct. 412 (2024).  The envelopes were
confiscated by officers who, based on training and experience, suspected the
orange strips were Suboxone.[4]
      The strips were transported to the crime
lab, where one of the strips was tested by forensic analyst Kimberly
Dunlap.  Dunlap concluded that the strip
contained a mixture of buprenorphine and naloxone, commonly referred to as
Suboxone.  In her written, initialed
notes marked by the crime lab identification number, Dunlap recorded the
procedures she said she undertook to reach her conclusion, including, inter
alia, her receipt of the strips from the Plymouth County sheriff's department,
the procedures she employed to perform an initial screening test, the protocols
she followed to prepare the strip for further analysis, her use of gas
chromatography-mass spectrometry (GC-MS)[5] for a confirmatory test, and her
conclusion based on the foregoing that the strip contained Suboxone.  Also in the case file were a printout from
the database Dunlap said she used during the screening test and the GC-MS
output from the confirmatory test Dunlap said she performed.
      Carrie LaBelle, a supervisor at the crime
lab, reviewed the case file pursuant to the crime lab's technical and
administrative review procedures. 
LaBelle, who was familiar with the protocols and procedures of the crime
lab, was not involved in the testing performed by Dunlap; she neither observed
nor participated in Dunlap's testing.
      The prosecution had intended to call
Dunlap to testify that the sixty-one strips contained Suboxone.  However, just prior to jury empanelment, the
prosecution notified the trial judge that it intended to call LaBelle as a "substitute
chemist" to identify the substance because Dunlap was "no longer with
the lab."[6]
      At trial, LaBelle testified that she was
"responsible for performing technical and administrative reviews" of
her peers' work.  She explained that
technical review means that "we will go through the case file, we'll
review all of their submitted data, we'll review their notes, and we make sure
that the notes and the conclusions that they've drawn from them are supported
scientifically," and that "[t]he administrative review portion is
looking for administrative aspects such as having a laboratory number on every
page and having the analyst's initials on every page."  LaBelle stated that she performed the
technical and administrative reviews of Dunlap's work on the defendant's case.
      LaBelle acknowledged that she had not
herself performed or observed the testing on any of the seized strips.[7]  Instead, LaBelle testified that Dunlap
"analyzed the specific substances." 

      LaBelle, who prior to her role as a
supervisor had been an analyst, then described the tests typically performed by
analysts at the crime lab:  
"The first
thing we do is we take a weight of [the item] before any analysis begins.  Each item that is tested should have a weight
recorded for it.  There should be a screening
test and a confirmatory test performed. 
And then each of those tests individually should have specific data,
which the analyst will record in their notes. 
So, they'll have the volume that they took, how much solution that they
put in the sample.  They'll put the type
of solution that they put the sample in, and then they'll write down their
results for each of those tests and then their final conclusion."  
An analyst's
typical first step, LaBelle testified, would be a "pharmaceutical
preparation," in which "[w]e first look for any identifiable markings
on the item itself" and conduct "a pharmaceutical identifier search,
and that's essentially just using an online database."  
      Then, LaBelle described the
"confirmatory test, which is where we actually will take a portion of the
sample, we'll analyze it chemically on a[n] instrument.  There's a couple different ones we use . . .
."  LaBelle also explained the
functioning of the GC-MS, stating the "particular instrument will separate
out all the different components of a mixture, and the mass spectrometer will
identify what those components are as they come off the instrument."
      LaBelle then pivoted from describing the
typical tasks performed by analysts to explaining Dunlap's process "for
this particular case."  As discussed
in more detail infra, LaBelle proceeded to relay the contents of Dunlap's
notes, testifying as to the steps Dunlap recorded having performed for an
initial screening test and for a confirmatory test using the GC-MS.  LaBelle also testified that she herself
observed the pharmaceutical identification markings on the strips, and reviewed
a printout from a database that Dunlap's notes indicated Dunlap used for the
initial screening, as well as the GC-MS output, both of which were in the case
file alongside Dunlap's notes.
      LaBelle stated that she reviewed
"the same data results that the person who did the initial analysis
saw," and that those results allowed her "to make a determination, to
a scientific degree of certainty" as to the identification of the analyzed
substance.  She opined that, "in
reviewing the data printouts independently, as another forensic scientist, the
data support[] a conclusion of buprenorphine and naloxone," which LaBelle
confirmed was commonly known as Suboxone.
      On cross-examination, LaBelle
acknowledged she reviewed Dunlap's "data" to confirm they satisfied
"the procedures and protocols" of the crime lab.  LaBelle testified that, while she was
"reviewing the data currently and saying that the data support[] a
conclusion of the results," she was "relying on a test performed by
another person."  
      On redirect, LaBelle testified that
"if any discrepancies are noticed during the technical or administrative
review[s]" a "fresh sample" would be tested, but that there were
no "discrepancies between the initial analysis and [LaBelle's] technical
and administrative review[s]" warranting a second test.  Asked expressly whether her opinion was based
on her "own review of the raw data," LaBelle reiterated only that she
was "reviewing the actual case file" and "giving an independent
conclusion based on that information." 

      Trial counsel moved to strike LaBelle's
testimony, arguing that "[a]ll she's doing is reviewing data, testifying
to conclusions that were arrived at by a person who is not here and not
available for cross-examination," and as such violated the defendant's
right to confrontation.  The trial judge
denied the motion to strike but noted the defendant's "rights are saved on
that issue."
      b. 
Prior proceedings.  In October
2021, the jury found the defendant guilty of unlawfully delivering a class B
controlled substance to a prisoner in violation of G. L. c. 268, § 28.[8]  The defendant was sentenced to six months in
a house of correction.  The defendant
timely appealed.
      The Appeals Court affirmed the
defendant's conviction.  Pertinently, the
Appeals Court rejected the defendant's confrontation clause challenge to
LaBelle's testimony, reasoning that LaBelle's opinion was independent based on
her review of the case file.[9]  See
Gordon, 103 Mass. App. Ct. 1112.  The
United States Supreme Court subsequently issued its decision in Smith, 602 U.S.
779; in October 2024, the Supreme Court granted the defendant's petition for
certiorari, vacated the Appeals Court's judgment, and remanded the case to the
Appeals Court for reconsideration in light of Smith.  We transferred the case to this court on our
own motion.
      2. 
Discussion.  a.  Standard of review.  "We review the defendant's constitutional
challenge de novo."  Commonwealth v.
Shepherd, 493 Mass. 512, 524 (2024).  
      b. 
Confrontation clause prohibition. 
The right of a defendant in a criminal trial to be confronted with the
witnesses against him or her, which is enshrined in the Sixth Amendment to the
United States Constitution,[10] limits the prosecution's ability to introduce
statements made by persons not in the court room.[11]  Smith, 602 U.S. at 783-784.  The right, however, does not extend to all
out-of-court statements; to fall within its ambit, the out-of-court statement
(i) must be admitted to prove the truth of the matter asserted (that is, the
statement must be hearsay), and (ii) must be testimonial.  See Davis v. Washington, 547 U.S. 813, 823
(2006) (confrontation right "applies only to testimonial
hearsay").  
      For a time, the Supreme Court concluded
that the confrontation right was satisfied so long as the testimonial hearsay
bore "adequate 'indicia of reliability.'"  Ohio v. Roberts, 448 U.S. 56, 65-66 (1980).  More than two decades ago, however, the
Supreme Court changed course to reflect the Court's interpretation of the
original understanding of the confrontation clause.  See Crawford v. Washington, 541 U.S. 36,
43-50 (2004) (reviewing historical origins of confrontation clause).  
      In Crawford, the Supreme Court explained
that admission of a testimonial out-of-court statement to prove the truth of
the matter asserted based on a judicial determination of reliability is
"fundamentally at odds with the right of confrontation."  Crawford, 541 U.S. at 61.  The confrontation right, the Supreme Court
concluded, "commands . . . not that evidence be reliable, but that
reliability be assessed in a particular manner: 
by testing in the crucible of cross-examination."[12]  Id. 
"Dispensing with confrontation because testimony is obviously
reliable," the Supreme Court stated, "is akin to dispensing with jury
trial because a defendant is obviously guilty. 
This is not what the Sixth Amendment prescribes."  Id. at 62. 
Accordingly, the Supreme Court determined that the confrontation clause
"bars the admission at trial of 'testimonial statements' of an absent
witness unless she is unavailable to testify, and the defendant has had a prior
opportunity to cross-examine her" (quotation, citation, and alteration
omitted).  Smith, 602 U.S. at 783.  See Crawford, supra at 59, 62.
      Relevant to the present circumstances, the
prohibition against testimonial hearsay applies "in full to forensic
evidence."  Smith, 602 U.S. at
783.  Thus, in Melendez-Diaz v.
Massachusetts, 557 U.S. 305, 308-312 (2009), the Supreme Court concluded that
the clause prohibited the introduction of forensic certificates setting forth
analysts' determinations that a tested substance was cocaine; the prosecution
had relied on the certificates in lieu of the analysts' testimony at trial.
      The Supreme Court rejected the
Commonwealth's argument that the "neutral scientific" nature of the
testing results recorded in the certificates satisfied the confrontation clause
and again emphasized that reliability did not govern the confrontation clause's
application; even "if all analysts always possessed the scientific acumen
of Mme. Curie and the veracity of Mother Theresa," the Supreme Court
"would reach the same conclusion."[13]  Id. at 318, 319 n.6.  Concluding that the defendant had the right
to cross-examine the analysts who had signed the certificates, the Supreme
Court underscored that the confrontation clause "commanded not reliability
but one way of testing it -- through cross-examination."  Smith, 602 U.S. at 785, citing Melendez-Diaz,
supra at 317.  
      The Supreme Court next addressed whether
the prosecution, consistent with the confrontation clause, can introduce a
forensic analyst's laboratory report as to a defendant's blood alcohol content
through the testimony of a surrogate expert who did not observe or perform the
tests conducted by the analyst but who worked in the same laboratory and was
familiar with the laboratory's procedures. 
See Bullcoming v. New Mexico, 564 U.S. 647, 651-652 (2011).  The Supreme Court determined that the
surrogate expert's testimony violated the confrontation clause.  Id. at 661-662.
      Even a qualified surrogate, the Supreme
Court reasoned, "could not convey what [the certifying analyst] knew or
observed about the events his certification concerned, i.e., the particular
test and testing process he employed"; cross-examination of a surrogate
could not "expose any lapses or lies on the certifying analyst's part."  Id. at 661-662.  Whether the prosecution introduced a
certificate of the results of forensic analysis in the form of a physical
document as in Melendez-Diaz or conveyed that same content through the
surrogate's testimony, the authoring analyst, the Supreme Court confirmed,
"became a witness [the defendant] had the right to confront."[14]  Bullcoming, supra at 663.  Notably, the State did not assert that the
surrogate expert offered an "independent opinion."  Id. at 662. 
See also id. at 673 (Sotomayor, J., concurring in part) (noting
"this is not a case in which an expert witness was asked for his
independent opinion about underlying testimonial reports that were not
themselves admitted into evidence").
      The Supreme Court addressed that scenario
in Williams v. Illinois, 567 U.S. 50 (2012). 
There, the absent analyst had created a deoxyribonucleic acid (DNA)
profile ostensibly based on a swab taken from the victim; thereafter, a State
expert, who did not work at the absent analyst's laboratory and had no
knowledge of that laboratory's operations, used the analyst's report containing
the DNA profile to search a State database that included the defendant's DNA
profile.  Id. at 59-61.  At trial, the State expert testified to her
"independent" opinion that there was a match between the defendant's
DNA profile in the State database and the "DNA profile found in semen from
the vaginal swabs of [the victim]," impliedly asserting that the DNA
profile created by the absent analyst was the profile from the victim's swab
and that it was obtained using sound scientific principles and procedures.[15]  Id. at 64, 71-72.  The State expert testified that it was a
"commonly accepted" practice in the field for one DNA expert to rely
on the records of another DNA expert, and that the absent analyst's laboratory
was accredited.  Id. at 60.  However, she acknowledged that she had no
firsthand knowledge of how the absent analyst had produced the DNA profile or
even whether the profile had in fact come from the swab taken from the
victim.  Id. at 61-62.  
      In a "fractured" decision, five
of the justices in Williams concluded that the State expert's opinion did not
violate the confrontation clause because the absent analyst's report either was
not hearsay or was not testimonial. 
Smith, 602 U.S. at 779, 788 & n.1. 
Four of these justices determined that because the State expert's
testimony regarding the absent analyst's DNA profile merely provided the basis
for the State expert's opinion, it was admitted to allow the jury to assess the
validity of the opinion and not for the truth of the absent analyst's
out-of-court statements.  Williams, 567
U.S. at 58.[16]  Writing for the four
dissenting justices, Justice Kagan (who would go on to author the Supreme
Court's Smith decision) concluded that when "the State elected to
introduce the substance of [the absent analyst's] report into evidence, the
analyst who generated that report became a witness whom [the defendant] had the
right to confront" (quotations and citation omitted).  Id. at 124-125 (Kagan, J., dissenting).  The dissent summarized, "the
[c]onfrontation [c]lause prevented the State from introducing that report into
evidence except by calling to the stand the person who prepared it.  So the State tried another route --
introducing the substance of the report as part and parcel of an expert
witness's conclusion" (citation omitted). 
Id. at 128.
      The Supreme Court most recently revisited
its confrontation clause jurisprudence in Smith, rejecting the rationale of the
plurality in Williams that statements of an absent analyst were offered solely
for the jury to assess the soundness of the testifying expert's opinion.  Smith, 602 U.S. at 800.  In Smith, a substitute expert, who worked in
the same laboratory as the original analyst but was not involved in the
defendant's case, offered an "independent" opinion as to the identity
of a controlled substance.  Id. at 783,
791.  The substitute expert based his opinion
on his review of (i) the analyst's notes, which recorded the analyst's
statements about the scientific methodology and the laboratory's policies and
practices she said she followed, as well as the tests she said she performed;
(ii) the raw data results from the tests she said she conducted on testing
equipment she said she used; and (iii) the analyst's report, which more
formally set forth the analyst's opinion as to the substance's identity.  Id. at 790. 
The State, however, did not call the original analyst to testify.  Id.
      In support of his testimony, the
substitute expert conveyed the analyst's statements.  "The State offered up that evidence so
the jury would believe it -- in other words, for its truth."  Id. at 800. 
The Supreme Court concluded, "When an expert conveys an absent
analyst's statements in support of his opinion, and the statements provide that
support only if true, then the statements come into evidence for their
truth."  Id. at 783.  If the statements were testimonial, an issue
the Supreme Court did not reach, then the introduction of the absent analyst's
statements violated the defendant's confrontation right.  Id. at 800-802.  
      Significantly, the Supreme Court also
rejected the State's argument that the substitute expert's opinion presented no
confrontation clause problem because he was providing his own "independent"
opinion based on his review of the absent analyst's work -- that is, the
Supreme Court addressed the issue left open in Bullcoming and unresolved in
Williams.  Smith, 602 U.S. at 798-799.  As discussed infra, the Supreme Court
determined that the confrontation clause prohibits a substitute expert from
offering an ostensibly independent opinion that depends on the truth of the
absent analyst's testimonial hearsay; in other words, the Supreme Court
rejected the argument that cross-examination of the substitute expert satisfied
the confrontation clause.  Id.    
      c. 
LaBelle's testimony.  To determine
whether the defendant's right to confrontation was infringed, we carefully
examine each aspect of LaBelle's testimony: 
(i) the crime lab's procedures and protocols; (ii) the content of
Dunlap's notes; and (iii) LaBelle's independent opinion based on her review of
the case file.  See Smith, 602 U.S. at
800-801, quoting Michigan v. Bryant, 562 U.S. 344, 369 (2011) ("A court
must . . . identify the out-of-court statement introduced, and must determine,
given all the 'relevant circumstances,' the principal reason it was
made").
      i. 
General background and protocols. 
To begin, LaBelle testified regarding the steps typically taken by
analysts to conduct an initial screening test and a confirmatory test, her
familiarity with the protocols in using GC-MS, and her role in connection with
technical and administrative reviews generally and in connection with Dunlap's
work in this case specifically.  This
testimony was based on LaBelle's personal knowledge and was not hearsay because
LaBelle was available to be cross-examined on these matters at trial.  See Smith, 602 U.S. at 799 (expert's
testimony regarding "how that lab typically functioned -- the standards,
practices, and procedures it used to test seized substances" -- was based
on personal knowledge and did not implicate confrontation clause).
      ii. 
Dunlap's notes.  Next, LaBelle
relayed Dunlap's statements recorded in her notes.  LaBelle first relayed the content of Dunlap's
notes regarding the screening test, testifying:
"So, the
first test that the analyst performed was a pharmaceutical ID.  So, what they did was, they input -- they
recorded in their notes what the imprint was that they observed on the actual
item of evidence.  They input that into
their choice of a database.  I believe
they used drugs.com, but I can double-check on that.  It gave back a preliminary identification of
buprenorphine and naloxone, and then that printout is retained in the case
record."  

      LaBelle's testimony regarding the
confirmatory test done by Dunlap using the GC-MS was much the same.  Based on Dunlap's preliminary identification
of buprenorphine and naloxone, LaBelle continued, "the analyst chose to do
the GC-MS instrument."  LaBelle
stated:  
"They took a
portion of one of the films, they recorded it into a solvent, I believe it was
methanol is what we commonly use, and then the instrument will print out data
after it goes -- runs through the instrument, and then that data we retain in
the case and is reviewable."
      
      A. 
Dunlap's notes were hearsay. 
Dunlap's notes purported to document the scientific methodologies Dunlap
employed, the practices and procedures Dunlap followed, the tests Dunlap
performed, and the results Dunlap obtained. 
With regard to the screening test, LaBelle had no personal knowledge
whether Dunlap input the pharmaceutical identification, assuming it was
accurately recorded from the strip Dunlap tested, into the database or another
input, or whether the result contained in the file was the result from the
database or a result from a different input. 
Similarly, regarding the confirmatory test, LaBelle did not actually
perform or observe Dunlap perform the procedures to prepare the tested sample
prior to its insertion into the GC-MS machine, Dunlap's use of the GC-MS
machine, or any other aspects of how Dunlap conducted the confirmatory
test.  LaBelle could not speak to the
truth of these steps that Dunlap reported in her notes and which LaBelle
conveyed to the jury.  See Smith, 602
U.S. at 796 (recognizing that substitute analyst, "though familiar with
the lab's general practices, had no personal knowledge about [the original
analyst's] testing of the seized items").  
      Yet LaBelle's opinion as to the identity
of the controlled substance depended on the truth of these statements.  "If believed true, [Dunlap's statements]
will lead the jury to credit [LaBelle's] opinion; if believed false, it will do
the opposite.  But that very fact is what
raises the [c]onfrontation [c]lause problem. 
For the defendant ha[d] no opportunity to challenge the veracity of the
out-of-court assertions that are doing much of the work" (citations
omitted).  Smith, 602 U.S. at 796.  The statements from Dunlap's notes that
LaBelle relayed to the jury were therefore hearsay.   
      B. 
Dunlap's notes were testimonial. 
Because the confrontation clause is only concerned with testimonial
hearsay, we next must determine whether the out-of-court statements in Dunlap's
notes, which LaBelle relayed to the jury, were testimonial.  Smith, 602 U.S. at 784 ("the [c]lause
confines itself to 'testimonial statements'" [citation omitted]).  The Supreme Court has offered "[v]arious
formulations" as to the scope of "testimonial," including
"statements that were made under circumstances which would lead an
objective witness reasonably to believe that the statement would be available
for use at a later trial."[17] 
Crawford, 541 U.S. at 40, 51-53 (declining to adopt any one formulation
because hearsay at issue -- wife's statement to police interrogators -- fell
"squarely within that class" of testimonial hearsay precluded by
confrontation clause).  To be testimonial,
an out-of-court statement's "primary purpose must have a focus on
court" (quotation and citation omitted). 
Smith, 602 U.S. at 802.  Here,
Dunlap's notes, as described by LaBelle, were testimonial.
      To begin, the strips were given to Dunlap
by State police officers for the purpose of developing evidence for use in the
defendant's criminal prosecution; in fact, when the strips were seized,
officers already suspected that they contained Suboxone.  See Bullcoming, 564 U.S. at 665, citing N.M.
Stat. Ann. § 29-3-4 (2004) (considering that "a [law enforcement] officer
provided seized evidence to a state laboratory required by law to assist in
police investigations" in reaching conclusion that laboratory report at
issue was testimonial).  An objective
witness in Dunlap's position would understand that her work to identify the
substance on the strip she tested was "in response to a police
request," which is one factor supporting the conclusion that the
statements she recorded in her notes were testimonial.  Melendez-Diaz, 557 U.S. at 317.
      In addition, by statute, the
"regularly conducted business activity" of the crime lab is to
conduct chemical analyses for law enforcement use, which is precisely the type
of analysis Dunlap recorded in her notes.[18] 
Melendez-Diaz, 557 U.S. at 321 (drug certificates were not admissible
under business records exception where "the regularly conducted business
activity is the production of evidence for use at trial").  As described, Dunlap's notes set forth
statements critical to the chemical analysis she performed for law enforcement
to provide proof necessary for the criminal case against the defendant; the
statements included the weight of the substance she tested, the pharmaceutical
marking she saw, the database she used for the screening test, the volume of
solution she used to prepare the tested strip, the type of solution she chose,
the protocols she followed, the instrument she used, and her opinion
identifying the controlled substance.  
      Moreover, although Dunlap's notes are not
in the record, they appeared (based on LaBelle's description)[19] to have had
at least some level of formality, containing Dunlap's initials and the crime
lab identification number on each page and her conclusion, further confirming
the testimonial nature of the notes.  See
Bullcoming, 564 U.S. at 665.  Of course,
not every notation by every analyst in the crime lab will be testimonial;
analysts at the crime lab no doubt engage in a "range of recordkeeping
activities."  Smith, 602 U.S. at
802.  But based on LaBelle's description,
Dunlap's notes, which apparently detailed her scientific procedures and
processes to determine the identity of the controlled substance for law
enforcement purposes, appear to have been directed at court.  The formal nature of the notes, according to
LaBelle's description, detailing a necessary element of the prosecution's case
at trial, see discussion infra, suggests that they were not merely
"reminders to self."[20]  Id.
      Indeed, we have consistently concluded
that notes such as Dunlap's, documenting findings, observations, and
conclusions made by an analyst at the behest of law enforcement, are
testimonial.  See Commonwealth v. Jones,
472 Mass. 707, 714 (2015) (nurse's statements made in labeling swabs and
completing "rape kit" "inventory list" "were plainly
testimonial" because "purpose of a 'rape kit' is to gather forensic
evidence for use in a criminal prosecution"); Commonwealth v. McCowen, 458
Mass. 461, 480 (2010) ("The observations, findings, and opinions of [the
nontestifying medical examiner] reflected in his notes and reports were
testimonial hearsay . . .").  See
also Commonwealth v. Munoz, 461 Mass. 126, 128-131 (2011), vacated and
remanded, 568 U.S. 802 (2012) (Commonwealth conceded that substitute expert's
testimony on direct examination as to "the procedure [the nontestifying
analyst] followed in weighing and analyzing the contents of the bags" as
well as "conclusions . . . by [the absent analyst] violated the
defendant's right of confrontation"). 
      On appeal, the Commonwealth marshals only
one argument that the notes were not testimonial; specifically, relying on
LaBelle's description of Dunlap's notes, it contends that "Dunlap's notes
existed to comply with laboratory accreditation requirements or to facilitate
internal review and quality control." 
Our decision in Commonwealth v. Barbosa, 457 Mass. 773 (2010), cert.
denied, 563 U.S. 990 (2011), is instructive. 
There, the substitute expert testified that "accreditation
standards require a full technical review on all DNA reports that are
issued," and that she (like LaBelle) conducted the technical review of the
nontestifying analyst's "worksheets and reports" accordingly.  Id. at 782. 
The expert then relayed the contents of those worksheets and reports to
the jury in support of her opinion, based on her review, that the DNA profiles
obtained from stains on items worn by the defendant included the victim and
excluded the defendant as a possible source. 
Id. at 781.  We concluded (and in
Barbosa the Commonwealth conceded) that the substitute expert's testimony
conveying the nontestifying analyst's out-of-court statements violated the
confrontation clause, despite the testimony that the out-of-court statements
also served to facilitate the laboratory's mandated technical review.  See id. at 782-784, 786.  
      Similarly, here, Dunlap reasonably would
anticipate that her notes "would be available for use at trial"
despite their usefulness also for purposes of the crime lab's technical and
administrative review processes; thus, Dunlap's notes were testimonial.  Barbosa, 457 Mass. at 784.  Because Dunlap's notes comprised testimonial
hearsay, LaBelle's testimony relaying the contents of Dunlap's notes violated
the confrontation clause.  See Crawford,
541 U.S. at 68.
      iii. 
LaBelle's independent expert opinion. 
We turn to consider whether, despite the constitutional violation
attendant to LaBelle's conveying Dunlap's testimonial hearsay to the jury, the
portion of LaBelle's testimony stating her "independent" opinion was
admissible.  Specifically, based on her
review of Dunlap's notes, the database printout, and the output from the GC-MS,
LaBelle opined that the "data support[] the identification of"
Suboxone.    
      A. 
Impact of Smith on substitute expert's independent opinion testimony.  The Supreme Court's decision in Smith
clarified that where a substitute expert's "proffered opinion merely
replicates, rather than somehow builds on, the testing analyst's
conclusions," the absent analyst is the "witness" against the
defendant in a constitutional sense. 
Smith, 602 U.S. at 791, 798-799. 
Significantly, the Supreme Court expressly rejected the State's argument
that the confrontation clause permitted a substitute expert to offer an
"independent" opinion based solely on his review of the absent
analyst's notes, report, and raw data. 
Id. at 798.  See Brief for
Respondent at 1, Smith, 602 U.S. 779 (noting that one source of expert's
opinion was "graphs reflecting machine-generated raw data" from
nontestifying analyst's GC-MS testing). 
In such a circumstance, the Supreme Court explained, the substitute
expert's ostensibly independent opinion was prohibited because the substitute
expert "could opine that the tested substances" were illegal drugs
"only because he accepted the truth of what [the absent analyst] had
reported about her work in the lab -- that she had performed certain tests
according to certain protocols and gotten certain results."  Smith, supra at 798.  Likewise, the jury could credit the
substitute expert's opinion only because they accepted the truth of what the
absent analyst reported about her laboratory work.  Id.  
"So the
State's basis evidence -- more precisely, the truth of the statements on which
its expert relied -- propped up its whole case. 
But the maker of those statements was not in the courtroom, and [the
defendant] could not ask her any questions."

Id.  Allowing the expert to testify to such an
opinion, the Supreme Court stated, would result in an "end run"
around the confrontation clause where "the proffered opinion [of the
substitute expert] merely replicates, rather than somehow builds on, the
[absent] testing analyst's conclusions."[21]  Id. at 799.
      Applying this reasoning, the United States
Court of Appeals for the Fourth Circuit concluded that a substitute expert's
opinion "founded on a [nontestifying] analyst's [testimonial] out-of-court
statements" violated the confrontation clause.  See United States v. Seward, 135 F.4th 161,
167-169 (4th Cir. 2025).  There, a
substitute DNA expert, one (like LaBelle) who had not conducted the underlying
analysis but who had performed the technical review and was familiar with the
State laboratory's procedures, provided an ostensibly "independent"
opinion dependent on the work of an absent analyst:  the absent analyst's testimonial hearsay
describing the processes and procedures followed to obtain the raw data, and
the raw data from the tests performed by the analyst.  Id. at 168. 
See Brief for Appellee at 23-24, Seward, supra (providing detail of
substitute expert's role).  
      Significantly, the Fourth Circuit
determined that Smith abrogated its prior case law -- case law that in
pertinent respect mirrors our own conclusions regarding our evidentiary rule's
compliance with the confrontation clause, discussed infra.  Seward, 135 F.4th at 169, citing United
States v. Summers, 666 F.3d 192, 201-202 (4th Cir. 2011), cert. denied, 568
U.S. 851 (2012).  Under that precedent, a
substitute expert could provide an "independent" opinion with respect
to what "objective raw data generated by [a nontestifying] analyst"
showed even if the opinion was dependent on the truth of the absent analyst's
testimonial hearsay regarding the procedures and processes followed to generate
the data; because the substitute expert's opinion was an "original product
that could be . . . readily tested through cross-examination," the Fourth
Circuit had reasoned prior to Smith, the defendant's right of confrontation was
not violated.  Seward, supra, quoting
Summers, supra at 201, 202.  After Smith,
the Fourth Circuit concluded, its precedent was no longer valid; the
defendant's confrontation right was not satisfied by cross-examination of the
substitute expert, even if the expert purported to provide an opinion based on
the raw data, because that opinion was dependent on the truth of the absent
analyst's testimonial hearsay as to the procedures and protocols the analyst
followed.  Seward, supra.
      In Seward, the substitute expert had not
"overtly" testified to the details of the absent analyst's work.  Instead, she described the laboratory's
protocols generally, and then she turned to the case at bar and stated that the
"lab analyzed" each swab, implying that the analysis had been
conducted pursuant to the protocols to which she had testified.[22]  Id. at 168.  In other words, the expert in Seward provided
her opinion but did not testify expressly to its testimonial hearsay
basis.  The Fourth Circuit nonetheless
concluded that the substitute expert's opinion was prohibited by the
confrontation clause.  Id. at 168-169.  "[T]he government," said the Fourth
Circuit mirroring the language in Smith, 
"may not
sidestep the Sixth Amendment problems created by having a witness testify to
their opinions that are founded on a non-testifying analyst's out-of-court
statements by simply omitting any questions about the analyst's work.  'Approving that practice would make' Smith
and several other post-Crawford decisions 'a dead letter . . . and allow for
easy evasion of the [c]onfrontation [c]lause.'" 
Seward, 135 F.4th
at 168, quoting Smith, 602 U.S. at 798.  
      The Supreme Judicial Court of Maine
similarly concluded that, applying the Supreme Court's analysis in Smith, the
confrontation clause barred a substitute expert's opinion identifying a
controlled substance based on the raw data from tests performed by an absent
chemist where that opinion was dependent on the truth of the testimonial
hearsay statements documenting how the chemist generated that raw data.  See State v. Thomas, 2025 ME 34.  In Thomas, the Maine court rejected the
State's argument that the substitute expert's opinion did not violate the
confrontation clause because the expert "had conducted an independent
review of [the nontestifying chemist's] data and had 'independently concluded
based on the data that the substance tested in [that] case [was]
fentanyl.'"  Id. at ¶¶ 27,
56-58.  Noting that the substitute expert
(unlike the expert in Smith) had conducted the technical review of the absent
chemist's work, the Maine court concluded nonetheless that his reliance on the
absent chemist's "file notes, test results, and sample profile, all
generated by and based on [the absent chemist's] actions, carrie[d] the same
problem identified by the Supreme Court in Smith."  Id. at ¶ 57.[23]  
The
reasoning of these cases is persuasive.[24] 
We conclude that, in light of the Supreme Court's decision in Smith,
where a substitute expert's opinion is dependent upon the truth of a
nontestifying analyst's testimonial hearsay, the confrontation clause bars admission
of the opinion even if the substitute expert is familiar with the testing
analyst's laboratory protocols and reviewed the analyst's case file; an
expert's opinion based on an absent analyst's test results that depends also on
the truth of the analyst's testimonial hearsay as to the processes and
protocols she said she followed to obtain those results is precluded by the
confrontation clause.[25]  Such expert
opinion testimony, after Smith, is prohibited because the relevant witness
against the accused, in a constitutional sense, is the absent analyst.[26]    
B.  Application. 
Here, LaBelle opined that the "data support[] the identification
of" Suboxone; LaBelle's opinion identifying the controlled substance
cannot be divorced from Dunlap's testimonial hearsay.  Indeed, in response to the prosecutor's direct
query whether LaBelle's opinion was based on her review of "the raw
data," LaBelle testified only that her opinion was based on
"reviewing the actual case file," which included Dunlap's notes.  LaBelle's opinion on the identification of
the controlled substance depended on the truth of Dunlap's out-of-court
statements, including her view of the GC-MS output for which she relied on the
truth of Dunlap's statements regarding the procedures and protocols Dunlap followed
to generate the output.  
Yet,
it is the prosecution's burden to prove its case without violating the
defendant's confrontation clause rights. 
See Bullcoming, 564 U.S. at 666 (prosecution "bears the
burden" of proving its case consistent with mandates of confrontation
clause); Melendez-Diaz, 557 U.S. at 324 ("the [c]onfrontation [c]lause
imposes a burden on the prosecution to present its witnesses"); Taylor v.
Illinois, 484 U.S. 400, 410 n.14 (1988) (constitutional rights such as that of
confrontation "are designed to restrain the prosecution by regulating the
procedures by which it presents its case against the accused.  They apply in every case, whether or not the
defendant seeks to rebut the case against him or to present a case of his own").  As discussed in detail infra, the
Commonwealth did not do so.
I.  Screening test.  Admittedly, with regard to the screening
test, LaBelle herself reviewed the pharmaceutical identification markings; but
she did not testify that she was able to determine that the printout from the
pharmaceutical database, which itself was not testimonial,[27] reflected the
results for the markings LaBelle personally observed.  Instead, LaBelle's opinion depended on the
truth of Dunlap's out-of-court statements that the pharmaceutical
identification of the seized substance was the imprint Dunlap recorded in her
notes, and that her database search showed the controlled substance was
Suboxone on an initial screening review. 

II.  GC-MS printout.  LaBelle testified that she reviewed a GC-MS
output in the case file.  Specifically,
after LaBelle testified regarding the content of Dunlap's notes, LaBelle and
the prosecutor had the following exchange: 

Q.:  "Did you yourself, during your technical
review, do a data review of the items on this particular case?"  
A.:  "Yes. 
So, in reviewing the data printouts independently, as another forensic
scientist, the data supports a conclusion of [Suboxone]."
Q.:  "So, in your opinion, can you say with a
degree of scientific certainty what that controlled substance is?"
A.:  "Yes."
Q.:  "Okay. 
And what is that?"
A.:  "Again, the data supports the
identification of [Suboxone]."  
Viewed in
isolation, this testimony might have suggested to the jury that LaBelle's
opinion rested solely on the GC-MS output; and the printout of the GC-MS output
itself, which was not introduced in evidence and is not in the record before
us, was not testimonial hearsay.[28]  
See Commonwealth v. Souza, 494 Mass. 705, 718-719 (2024), quoting
Commonwealth v. Davis, 487 Mass. 448, 465 (2021), S.C., 491 Mass. 1011 (2023)
("'[c]omputer-generated records are created solely by the mechanical
operation of a computer and do not require human participation' -- i.e., they
do not contain a statement from a person").  See also United States v. Moon, 512 F.3d 359,
362 (7th Cir.), cert. denied, 555 U.S. 812 (2008) (raw results not
"statements" and machine not "declarant" because "how
could one cross-examine a gas chromatograph?"); United States v. Washington,
498 F.3d 225, 229-231 (4th Cir. 2007), cert. denied, 557 U.S. 934 (2009)
(machine-generated data of chemical composition of defendant's blood were not
hearsay statements); People v. Lopez, 55 Cal. 4th 569, 589-590 (2012), cert.
denied, 568 U.S. 1217 (2013) (noting that "the printout produced by the
gas chromatograph machine, which was not hearsay, was properly admitted and
explained by the expert testimony"). 

Neither
Smith nor the cases that have followed, see discussion supra, expressly address
the situation where a substitute expert provides an opinion based only on raw
data, like the GC-MS output in this case. 
Nor do we face that situation here.[29] 
As the Commonwealth rightly concedes, LaBelle's opinion identifying the
controlled substance did not rely on the GC-MS output alone.  The Commonwealth instead acknowledges that
LaBelle's opinion also depended on Dunlap's notes.  Specifically, LaBelle's opinion identifying
the controlled substance depended on the truth of Dunlap's out-of-court statements
as to the proper procedures and protocols she said she used in inputting the
tested sample into the GC-MS and the GC-MS output.  Indeed, the above-quoted testimony was
provided immediately following LaBelle's testimony describing the content of
Dunlap's notes, which as discussed supra, were testimonial hearsay.  Those notes, according to LaBelle, recorded
Dunlap's statements as to what Dunlap did to prepare a strip for analysis by
the GC-MS, the procedures and protocols Dunlap said she followed, and the
results of the GC-MS testing retained by Dunlap in the case file.  On cross-examination, trial counsel asked
LaBelle whether she was "relying on the conclusions and opinions of
[Dunlap,] who did the actual test." 
LaBelle responded, confusingly, "So, I am reviewing the data
currently and saying that the data supports a conclusion of the results."
On
redirect examination, the prosecutor attempted to clarify the basis of
LaBelle's opinion testimony, asking, "And finally, as it relates to your
opinion about this substance, is that based on the work of someone else or your
own review of the raw data?" 
LaBelle did not testify that she was relying on the raw data; instead,
she responded to the prosecutor's direct inquiry as follows:  "In reviewing the actual case file,
which I have here, I'm giving an independent conclusion based on that
information."  The "actual case
file," which LaBelle had in her hands as she testified, was described
earlier by LaBelle; it included Dunlap's notes recording the weight of the
substance to be tested, whether Dunlap performed a screening test and a
confirmatory test, "specific data" for each test, the volume that
Dunlap took, how much solution she used, the type of solution she used, the
results for each test, and Dunlap's final conclusion.  
      Thus, LaBelle's opinion as to the
identity of the controlled substance did not rest on the raw data set forth in
the GC-MS output alone; instead, her opinion depended on the truth of the
statements set forth in Dunlap's notes, the substance of which LaBelle conveyed
to the jury by testifying that Dunlap had performed the tests that Dunlap's
notes stated that she performed according to proper protocols.  
      To be sure, LaBelle also was the
technical and administrative reviewer of Dunlap's work, reviewing Dunlap's
notes contemporaneously for quality assurance. 
But the record does not indicate that LaBelle's contemporaneous role
provided her with any personal knowledge as to the truth of the statements in
Dunlap's notes upon which she relied in forming her opinion.  LaBelle's technical and administrative
reviews, and her conclusion that Dunlap complied with laboratory protocols and
procedures, rested on the truth of Dunlap's statements as to the process Dunlap
said she undertook and the sample Dunlap said she tested; LaBelle observed none
of these actions reported by Dunlap.  Cf.
Bullcoming, 564 U.S. at 673 (Sotomayor, J., concurring in part) (suggesting
"[i]t would be a different case if, for example, a supervisor who observed
an analyst conducting a test testified about the results or a report about such
results" [emphasis added]).  See
Thomas, 2025 ME 34, ¶¶ 56-58 (substitute chemist compared data produced by
GC-MS to known profile of fentanyl to opine on match, but his opinion relied on
nontestifying chemist's "report that the particular data [from the GC-MS]
came from the samples seized from [the defendant]").
      While LaBelle asserted that her opinion
was "independent" and based on her review of the "data" in
the case file, LaBelle did not observe Dunlap perform the steps Dunlap
described in her notes, and importantly, LaBelle did not testify that anything
other than her acceptance of the truth of Dunlap's out-of-court statements,
which LaBelle related to the jury, permitted her to confirm Dunlap's
self-described compliance with the crime lab's procedures or that the raw data
reflected the testing of the strip seized at the house of correction.  See, e.g., Barbosa, 457 Mass. at 782
(testifying expert conducted technical review of absent analyst's out-of-court
statements, including worksheets and reports, and had signed analyst's final
report but "only way to be certain that a mistake did not occur . . .
would be to retest the samples" because testifying expert was not "standing
over [the absent analyst's] shoulders").[30]  She did not testify, for example, that
something about the database printout or the GC-MS output allowed her to
confirm the procedures Dunlap said she performed in compliance with the crime
lab's protocols, or that this data permitted her to conclude that they
reflected the strip Dunlap said she tested.
      Thus, informed by the Supreme Court's
reasoning in Smith, we conclude that LaBelle's opinion identifying the
controlled substance was "independent" in name only.  She reviewed the GC-MS output, which was not
testimonial hearsay, but her opinion identifying the controlled substance,
including her interpretation of the GC-MS output, was dependent on the truth of
Dunlap's out-of-court testimonial statements. 
See Smith, 602 U.S. at 799. 
Although LaBelle was a crime lab supervisor and had reviewed Dunlap's
notes as part of that role, Dunlap (not LaBelle) was the witness against the
defendant in a constitutional sense; cross-examination of LaBelle could not
ferret out any incompetence, fraud, weaknesses, mistakes, or other limitations
that might not be apparent on the face of Dunlap's notes.  See id. at 796-799.  Accordingly, LaBelle's opinion identifying
the controlled substance violated the confrontation clause.  Here, the absence of Dunlap's live testimony
violated the defendant's confrontation right, as discussed supra, and precluded
LaBelle's opinion. 
d.  Impact of Smith on our common-law evidentiary
rule.  We have repeatedly examined our
evidentiary rule following the Supreme Court's decisions concerning the
confrontation clause, each time concluding that our evidentiary rule was more
protective than the confrontation clause. 
See Commonwealth v. Tassone, 468 Mass. 391, 399 (2014).  Following the change in confrontation clause
jurisprudence set forth in Smith, discussed supra, we conclude that our
evidentiary rule does not pass constitutional muster where an expert testifies
to an opinion that depends on the truth of the testimonial hearsay of a nontestifying
analyst; this is true even where the expert's opinion also is based on the
expert's analysis of raw data generated by the nontestifying analyst that
depends on the truth of the analyst's testimonial hearsay as to the sample she
says she tested and the processes and protocols she says she followed to obtain
the raw data.  See, e.g., Seward, 135
F.4th at 167-169.
      Briefly, under our evidentiary rule, an
expert opinion is admissible even if it is based on facts and data not in
evidence so long as such facts and data are independently admissible and of the
type reasonably relied upon by experts in the particular field in formulating
an opinion.[31]  See Department of Youth
Servs. v. A Juvenile, 398 Mass. 516, 531-532 (1986).  In contrast, the basis evidence -- that is,
admissible but not admitted facts and data -- is inadmissible on direct
examination of the testifying expert. 
Id.
      Where the basis of an expert's opinion is
the testimonial hearsay of an absent analyst, our evidentiary rule implicates
the defendant's right of confrontation. 
See Barbosa, 457 Mass. at 784. 
Each time that we examined it prior to Smith, however, we concluded that
our evidentiary rule comported with the defendant's confrontation right.  See Commonwealth v. Greineder, 464 Mass. 580,
584-589, cert. denied, 571 U.S. 865 (2013) (reviewing cases).  See also Tassone, 468 Mass. at 399 ("Our
common law of evidence is more protective of confrontation rights . . .").  
In
so concluding, we reasoned that our rule prohibits the introduction of
testimonial hearsay on direct examination of the expert; thus, the absent
analyst's out-of-court statements would not be introduced on direct examination
at all, let alone for the truth of the matter asserted.  See Commonwealth v. Chappell, 473 Mass. 191,
202 (2015) ("an expert witness is not permitted to testify on direct
examination to facts or data that another, nontestifying expert has generated,
or to the nontestifying expert's own opinion, even though this information may
be an important part of the basis of the testifying expert's
opinion").  Such hearsay comes into
evidence under our rule only if the defendant "opens the door"
through cross-examination.  See
Greineder, 464 Mass. at 600 (defendant who elicits hearsay data on
cross-examination "waives his confrontation right"); Barbosa, 457
Mass. at 785 (defendant "cannot reasonably claim that his right to
confront the witnesses against him is violated by the admission of evidence
that he elicits on cross-examination"). 

In
addition, we reasoned that our evidentiary rule did not impinge on the
confrontation right because the expert witness would be subject to
cross-examination concerning his or her expert opinion and the reliability of
the absent analyst's testimonial hearsay. 
See Greineder, 464 Mass. at 584, 594-595.  We previously recognized that to comport with
the defendant's confrontation right, the proffered expert must be capable of
being meaningfully cross-examined, see Tassone 468 Mass. at 400-402; not any
old expert will do, see Smith, 602 U.S. at 798, citing Bullcoming, 564 U.S. at
659-661.  Meaningful cross-examination
requires, at a minimum, that the expert who relies on the testimonial hearsay
of an absent analyst generally should be familiar with the protocols and
processes of the absent analyst's laboratory. 
See, e.g., Tassone, supra at 401-402 (substitute DNA expert's opinion
improperly admitted where expert was not affiliated with testing analyst's
laboratory, had no personal knowledge of laboratory's protocols, and had not
seen testing analyst's worksheets generated during testing).  But see Commonwealth v. Nardi, 452 Mass. 379,
388-391 (2008) (substitute medical examiner's opinion properly admitted because
it was based on review of nonhearsay "autopsy photographs and pathology
samples," photographs and blood evidence at crime scene, statements
regarding body decomposition that had been introduced in evidence, and
testimonial hearsay recorded in absent medical examiner's autopsy report,
despite substitute being from different office).  
      We held that an expert who relied on an
absent analyst's testimonial hearsay would have to do more than
"parrot[]" the analyst's conclusions; the expert's opinion would have
to be "independent." 
Greineder, 464 Mass. at 595. 
Under the evidentiary rule, however, we concluded that an expert's
opinion would be "independent" where the expert reviewed the data
from tests run by the absent analyst, even though he or she did not observe the
analyst perform the tests and instead relied on the truth of the analyst's
out-of-court statements that the analyst complied with laboratory protocols and
accepted scientific methodologies.  See
id.  
      Recognizing that the defendant may be
"disadvantaged" because he or she cannot cross-examine the testing
analyst regarding the analyst's actual compliance with laboratory protocols,
any mishandling or mislabeling of the substance tested, or outright
manipulation and fraud, we nonetheless allowed, under our evidentiary rule, the
expert to testify to his or her "independent" opinion despite this
"practical limitation" on the scope of cross-examination, which
"exists whenever any expert relies on the results of tests, experiments,
or observations conducted by another." 
Barbosa, 457 Mass. at 790.  We
reasoned that an expert who did not observe the absent analyst's testing
nonetheless could be meaningfully cross-examined on the absent analyst's work
because "[r]easonable reliance . . . implies that the expert will have
ascertained that the data on which he or she relies are adequate and
appropriate to the task and were prepared in conformity with accepted . . .
scientific . . . practices and procedures."  Greineder, 464 Mass. at 596, quoting Munoz,
461 Mass. at 134.
Thus,
under our evidentiary rule, LaBelle's reliance on the facts and data recorded
in Dunlap's notes would not have precluded LaBelle from providing her opinion.[32]  She was the crime lab supervisor, familiar
with the crime lab's protocols and procedures; in fact, prior to her
supervisory role, LaBelle had been an analyst. 
She performed the technical and administrative reviews on the case
file.  LaBelle's testimony was
"independent" under our evidentiary rule because she reviewed the raw
data from Dunlap's work, including the database printout and GC-MS output,
which supported the identification of the controlled substance because Dunlap's
testimonial hearsay stated that the data were generated according to proper
protocols and procedures.  See Greineder,
464 Mass. at 596.  As such, LaBelle's
opinion would have been admissible under our evidentiary rule.  See, e.g., Commonwealth v. Grady, 474 Mass.
715, 723-724 (2016) (permitting laboratory supervisor who conducted technical
review of testing analyst's work to state "independent" opinion that
seized substance was cocaine based on review of data generated by testing
analyst); Commonwealth v. Gonzalez, 93 Mass. App. Ct. 6, 13 (2018) (allowing
testimony regarding identity of controlled substance from substitute chemist
who reviewed testing analyst's work and evaluated data to reach
"independent" opinion). 
Following Smith, this aspect of our evidentiary rule, which permits a
substitute expert who is a supervisor of the crime lab to provide an opinion
regarding raw data generated by an absent analyst that depends on the truth of
the testimonial hearsay of an absent analyst as to the processes and protocols
she says she followed to obtain the data, no longer comports with the right of
confrontation, and the admission of such expert opinion testimony is an error
of constitutional dimension.
      e. 
Review of constitutional error. 
Where, as here, the defendant's rights were preserved through objection
at trial,[33] "we evaluate the admission of constitutionally proscribed
evidence to determine whether it was harmless beyond a reasonable
doubt."  Commonwealth v. Rand, 487
Mass. 811, 814-815 (2021), quoting Commonwealth v. Wardsworth, 482 Mass. 454,
458 (2019).  Unless we are satisfied that
the "'erroneously admitted [evidence] had little or no effect on the
verdicts,'" "[a] violation of the right to confrontation requires a
new trial."[34]  Commonwealth v.
Montrond, 477 Mass. 127, 138 (2017), quoting Commonwealth v. Vasquez, 456 Mass.
350, 362 (2010).
To
assess the effect of a particular witness's testimony on the verdict, we
generally consider "the importance of the witness'[s] testimony in the
prosecution's case, whether the testimony was cumulative, the presence or
absence of evidence corroborating or contradicting the testimony of the witness
on material points, the extent of cross-examination otherwise permitted, and,
of course, the overall strength of the prosecution's case."  Commonwealth v. Vardinski, 438 Mass. 444, 452
(2003), quoting Commonwealth v. DiBenedetto, 414 Mass. 37, 40 (1992), S.C., 427
Mass. 414 (1998).  "[T]he
prosecution bears the burden of establishing that the error was harmless,"
and "[w]e resolve all ambiguities and doubts in favor of the
defendant."  Vardinski, supra at
452-453.
LaBelle
was a key witness for the prosecution. 
She alone testified that the strips that the defendant passed to the
inmate contained a controlled substance. 
Other evidence, such as the jail telephone calls, suggested that the
defendant was involved in a scheme to pass something to the inmate using the
ruse of providing the inmate with legal paperwork, and the officers who
confiscated the strips from the inmate suspected they contained Suboxone; but
only LaBelle's testimony confirmed the presence of the controlled substance, an
essential element of the government's case. 
See G. L. c. 268, § 28.  As we
have observed, portions of LaBelle's testimony were muddled; viewed in
isolation, one portion of this testimony might have suggested that her opinion
rested on the raw data set forth in the GC-MS output alone.  But, as the Commonwealth concedes, her
opinion as to the significance of the raw data was dependent on the truth of
the contents of Dunlap's notes, which LaBelle also related to the jury to
inform the jury of the procedures Dunlap recorded as having followed.  In brief, LaBelle's opinion regarding the
meaning of the raw data depended on the truth of Dunlap's testimonial hearsay
as to the procedures and protocols Dunlap said she followed.  Thus, the Commonwealth has not shown that
LaBelle's erroneously admitted testimony based on and relating that testimonial
hearsay had "little or no effect" on the jury.  See Montrond, 477 Mass. at 138.  
Far
from meeting its burden to prove its case without violating the defendant's constitutional
right to confront the witnesses against her, here, the Commonwealth's critical
evidence on the identity of the substance was dependent on the truth of
Dunlap's testimonial hearsay.  See
Bullcoming, 564 U.S. at 666; Melendez-Diaz, 557 U.S. at 324; Taylor, 484 U.S.
at 410 n.14.  In short, LaBelle's opinion
testimony and her testimony regarding the content of Dunlap's notes necessarily
affected the verdict.  See Montrond, 477
Mass. at 138.  The error in admitting the
constitutionally infirm portions of LaBelle's testimony was therefore not
harmless beyond a reasonable doubt.  See
Rand, 487 Mass. at 814-815.  
Notably,
the Commonwealth has not tried to show otherwise.  See note 33, supra.  Instead, in connection with its erroneous
assertion of the standard of review for unpreserved error, the Commonwealth
contends that the defendant did not contest the identification of the substance
as Suboxone, and that the defense at trial was only that the defendant was not
aware that the envelopes she delivered contained Suboxone.
      We addressed and rejected a similar
argument in Vasquez, 456 Mass. 350.  In
Vasquez, the defendant was convicted of possession and distribution of cocaine,
and at trial -- which took place before Melendez-Diaz -- the Commonwealth
introduced forensic certificates to prove the identity of the substances at
issue.  Id. at 351-354.  Defense counsel did not object to the
admission of the certificates and in closing argument "appeared to concede
that the substances in question were narcotics"; instead, "[t]he
defense was mistaken identity."  Id.
at 354-355.  
Nevertheless,
we treated the constitutional error as preserved, in part because objection
would have been futile under our pre-Melendez-Diaz jurisprudence, and turned to
consider whether the error was harmless beyond a reasonable doubt.  Vasquez, 456 Mass. at 356.  We concluded that it was not, even though the
defense at trial did not hinge on the identification evidence; the admission of
the certificates was "the only direct evidence that the white powder . . .
seized was cocaine," an element of the crimes charged against the
defendant, and thus may have had an effect on the fact finder and contributed
to the verdicts.  See id. at
366-367.  Similarly, here, even though the
defendant did not continue to press the issue once the motion to strike
Labelle's testimony was denied, the prosecution bore the burden to establish
the identity of the controlled substance and only LaBelle's improper opinion
testimony provided that proof.
Moreover,
the defense that was pursued -- that the defendant did not know the strips
contained a controlled substance -- was not inconsistent with a defense based
on the failure of the prosecution to show that a controlled substance had been
delivered.  See Vasquez, 456 Mass. at 368
("a preserved constitutional error . . . cannot go unchecked on appeal
because the defendant did not build his defense around it").  Indeed, the defendant objected to LaBelle's
testimony and tried to strike it from the record.  Following that objection, particularly where
the error went "to the heart of the government's case," the defendant
"ha[d] no further obligation . . . to contest the issue.  There is, and should be, no burden on a
defendant to continue to object to evidence at the risk of losing [her]
constitutional rights."  Id.  Had that objection been sustained and the
testimony stricken, as it should have been in view of Smith, the defendant
would have had another defense -- namely, that the prosecution had not shown a
violation of G. L. c. 268, § 28, at all. 
In these circumstances, the constitutional violation was not harmless
beyond a reasonable doubt.
      f. 
Retroactivity.  Our conclusion
drawn from Smith that the confrontation clause prohibits a substitute expert's
opinion that is dependent on the truth of a nontestifying analyst's testimonial
hearsay, including an expert's view of raw data dependent on the truth of an
analyst's testimonial hearsay, departs from our precedent and breaks new
ground; it is therefore a new rule.  See
Commonwealth v. Sylvain, 466 Mass. 422, 428 (2013), S.C., 473 Mass. 832 (2016),
quoting Teague v. Lane, 489 U.S. 288, 301 (1989) ("a case announces a new
rule when it breaks new ground or imposes a new obligation on the States . . .
[or] if the result was not dictated by precedent existing at the time the
defendant's conviction became final"); Commonwealth v. Melendez-Diaz, 460
Mass. 238, 239-240 (2011), citing Teague, supra.  Accordingly, the new rule applies to the
defendant because her case is before us on direct review, but the rule "is
not applicable to convictions . . . that had become final prior to its
issuance."  Commonwealth v. Boria,
460 Mass. 249, 251 (2011) (denying defendant's request "to apply
Melendez-Diaz retroactively to the collateral challenge to her
conviction").
      3. 
Conclusion.  For the foregoing
reasons, we vacate the defendant's conviction of unlawfully delivering a class
B controlled substance to a prisoner, G. L. c. 268, § 28, and remand for a new
trial consistent with this opinion.
                                          So
ordered.

      GEORGES, J. (concurring in the judgment,
with whom Gaziano, J., joins).  I concur
with the court's judgment but write separately because I do not agree that the
admission of Carrie LaBelle's ultimate opinion violated the defendant's right
to confrontation under the Sixth Amendment to the United States
Constitution.  Ante at    .  In
reaching its conclusion, the court reads the United States Supreme Court's
decision in Smith v. Arizona, 602 U.S. 779 (2024), to abrogate our precedent
allowing a testifying expert to offer an independent opinion based on testing
conducted by a nontestifying analyst. 
Ante at    .  This reading of Smith goes too far.  An expert who independently reviews raw, machine-generated
data and testifies to her own conclusions -- based on her training and
experience -- does not violate the confrontation clause.  See Commonwealth v. Souza, 494 Mass. 705,
718-719 (2024).  
      Nonetheless, while I disagree with the
court's application of Smith to LaBelle's opinion, I cannot conclude on this
record that other portions of her testimony -- specifically those concerning
Kimberly Dunlap's notes -- were properly admitted or, if not, that their
admission was harmless beyond a reasonable doubt.  I therefore concur in the judgment of the
court.
      1. 
Lack of impact of Smith in Massachusetts.  The court reads Smith as if it announced a
categorical rule that any exposure by a substitute expert to testimonial
hearsay, however incidental, taints the entirety of that expert's opinion, even
when the opinion rests on independent analysis of raw, machine-generated
data.  Ante at    . 
According to the court, when a testifying expert relies both on
machine-generated data -- which, as discussed below, is not testimonial hearsay
-- and on a nontestifying analyst's statements about "the processes and
protocols she said she followed to obtain those results," the entire
opinion becomes inadmissible under the confrontation clause.  Id. at   
.  
      Smith imposes no such bright line
rule.  Rather, Smith addressed the
admissibility of hearsay conveyed by a testifying expert in support of that
expert's opinion.  Smith, 602 U.S. at
783.  The Supreme Court held that when
"an expert conveys an absent analyst's statements in support of his
opinion, and the statements provide that support only if true," the
statements are offered for their truth and are inadmissible if
testimonial.  Id.  In doing so, the Court expressly abrogated
the contrary plurality rule in Williams v. Illinois, 567 U.S. 50, 58 (2012),
which had permitted such statements to be admitted not for their truth, but to
explain the basis of the expert's opinion. 
See Smith, supra at 795.  
      Our pre-Smith case law already reflects this
understanding:  the critical inquiry is
whether the testifying expert has formed an independent opinion based on the
expert's own analysis.  See Commonwealth
v. Greineder, 464 Mass. 580, 595, cert. denied, 571 U.S. 865 (2013);
Commonwealth v. Barbosa, 457 Mass. 773, 783–784 (2010), cert. denied, 563 U.S.
990 (2011).  If so, the opinion does not
violate the defendant's confrontation rights because the expert is testifying
at trial and subject to cross-examination. 
Barbosa, supra.  It is only when
the expert functions as a "conduit" for a nontestifying analyst's
opinion that the testimony becomes inadmissible testimonial hearsay (citation
omitted).  Greineder, supra.  See Commonwealth v. Chappell, 473 Mass. 191,
202 (2015) ("an expert witness is not permitted to testify . . . to the
nontestifying expert's own opinion").
      Smith addresses the admissibility of the
basis for an expert's opinion -- not the opinion itself.  See, e.g., Smith, 602 U.S. at 783 (case
concerns admissibility of "absent analyst's statements in support of
[testifying expert's] opinion").  It
does not address whether a testifying expert may rely on machine-generated data
in forming an admissible opinion.  That
distinction matters.  Massachusetts law
has long drawn a line between the admissibility of the expert's opinion and the
inadmissibility of any hearsay statements underlying that opinion.[35]  Greineder, 464 Mass. at 584.  
      The court emphasizes the phrase in Smith
describing an expert who "merely replicates, rather than somehow builds
on," a nontestifying analyst's opinion. 
Smith, 602 U.S. at 799.  This
language does not impose a new requirement that a testifying expert must
"build on" a prior opinion to render his or her own opinion
admissible.  Rather, it addresses whether
the testifying expert is simply repeating hearsay that is potentially
testimonial.  Id.  Accordingly, Smith does not displace our
long-standing framework for determining whether an expert opinion is
independent for confrontation purposes.[36] 
By interpreting Smith otherwise, the court has needlessly unsettled
Massachusetts law.  
Under
our precedent, exposure to some testimonial hearsay does not automatically
render a substitute expert's opinion inadmissible.  See, e.g., Commonwealth v. Nardi, 452 Mass.
379, 390–391 (2008) (no confrontation clause violation where testifying
expert's opinion relied on testimonial hearsay but reflected expert's own
analysis).  Nor is an opinion
inadmissible simply because the testifying expert reaches the same conclusion
as the nontestifying analyst; two experts may independently arrive at the same
conclusion.  Id. at 390.
Our
cases focus on whether the testifying expert's opinion is meaningfully
independent, based on the totality of the information reviewed.  Nardi, 452 Mass. at 389–390.  When the materials include computer-generated
records, the confrontation analysis further depends on the nature of the
data:  whether it is "'computer-generated,'
'computer-stored,' or a hybrid of both." 
Commonwealth v. Davis, 487 Mass. 448, 465 (2021), S.C., 491 Mass. 1011
(2023).  See, e.g., Souza, 494 Mass. at
718; Commonwealth v. Brea, 488 Mass. 150, 159–160 (2021).  Purely machine-generated data -- such as a
gas chromatography–mass spectrometry (GC-MS) printout -- does not constitute
hearsay because it is created automatically, without human input.  Souza, supra. 
See United States v. Moon, 512 F.3d 359, 362 (7th Cir.), cert. denied,
555 U.S. 812 (2008); United States v. Washington, 498 F.3d 225, 230 (4th Cir.
2007), cert. denied, 557 U.S. 934 (2009). 
As Justice Sotomayor noted in her concurrence in Bullcoming v. New
Mexico, 564 U.S. 647, 673–674 (2011), the Court did not decide whether "a
State could introduce . . . raw data generated by a machine in conjunction with
the testimony of an expert witness." 
That was likewise the case in Smith.
      Accordingly, expert opinions based on raw,
machine-generated data remain admissible under the confrontation clause, even
after Smith.  A qualified expert may
testify to her own opinion based on machine output -- such as a GC-MS printout
-- even if she did not personally conduct the underlying test.  See Souza, 494 Mass. at 718-719.  This principle has been reaffirmed in
multiple post-Smith decisions.  See,
e.g., Gourley v. State, 710 S.W.3d 368, 378 n.3 (Tex. App. 2025)
(distinguishing Smith where testifying expert "formed his own conclusions
based upon his review of the raw data"); State vs. Shea, Minn. Ct. App.,
No. A23-1523, slip op. at 10-11 (Sept. 9, 2024) (testimony admissible where
expert independently reviewed machine-generated data); State vs. Kellum, N.M.
Ct. App., No. A-1-CA-41306, slip op. at 6-7 (Apr. 23, 2025) (testifying expert
"came to independent conclusions based on his review of the data from the
machine" despite reviewing nontestifying expert's notes).[37]  These decisions correctly distinguish between
testimonial statements and the routine, standardized production of raw
machine-generated data.[38]
      Even so, whether an expert's opinion is
based on machine-generated data is not the only consideration in determining
the admissibility of that opinion.  We
have long required that a testifying expert possess meaningful knowledge of the
relevant laboratory processes, typically through affiliation with the
laboratory, familiarity with its protocols, or service as a technical reviewer
of the prior analyst's work.  See
Commonwealth v. Sanchez, 476 Mass. 725, 732 (2017); Barbosa, 457 Mass. at
791.  We have accordingly disallowed
testimony from experts lacking such foundational knowledge.  See Commonwealth v. Tassone, 468 Mass. 391,
401–402 (2014).
      Nothing in Smith disturbs this rule.  To the contrary, courts applying Smith have
reaffirmed that a testifying expert may offer an independent opinion where the
expert has sufficient familiarity with the underlying testing and
procedures.  See Dunlap vs. State, Md.
App. Ct., No. 969, Sept. Term, 2023, slip op. at 23 (Apr. 8, 2025)
("Nothing in Smith undermines" Maryland's rule permitting technical
reviewer to testify to reviewer's own conclusions);[39] Shea, Minn. Ct. App.,
No. A23-1523, slip op. at 10-11 (expert testimony admissible where expert
served as technical reviewer).
      This requirement serves an essential
purpose:  it ensures that the expert can
be meaningfully cross-examined -- not necessarily about every step taken by the
original analyst, but about the reliability of the data and the soundness of
the expert's own interpretation.  See
Greineder, 464 Mass. at 596-598.  Where
the expert has sufficient familiarity with the laboratory's standard protocols,
or has served as the technical reviewer, the defendant retains a fair
opportunity to test the basis for the expert's conclusions.  See id. 
See also Sanchez, 476 Mass. at 732. 
Cross-examination may probe whether the expert made unwarranted
assumptions, failed to account for potential error, or over-relied on data that
appear flawed or incomplete.  See
Greineder, supra; Barbosa, 457 Mass. at 791. 
Although the expert may not be able to answer how a particular analyst performed
a specific procedure, the expert must still be able to explain why the raw data
can be trusted and how, in the expert's independent judgment, that raw data
supports the conclusion offered at trial. 
Greineder, supra at 596.  
      2. 
Application.  a.  LaBelle's independent expert opinion.  At trial, LaBelle was asked whether she could
state, "with a degree of scientific certainty," the identity of the
controlled substance reflected in the data she reviewed.  She responded, "[I]n reviewing the data
printouts independently, as another forensic scientist, the data supports a
conclusion of Buprenorphine and Naloxone" (emphasis added).  Notably, she did not refer to or adopt
Dunlap's conclusions; instead, she testified based on her own interpretation of
the "data."  
      The critical question is what
"data" LaBelle relied upon. 
Even assuming, as the court does, that Labelle's reference to
"data" included some testimonial hearsay from Dunlap's notes, that
alone does not render her opinion inadmissible. 
The relevant inquiry is whether her conclusion rested on an independent
analysis.  Labelle's testimony that she
reached her conclusion "with a degree of scientific certainty,"
strongly indicates that she did not simply repeat Dunlap's conclusions.  To express that level of certainty, she
necessarily would have relied primarily, if not exclusively, on the GC-MS
results.  As the court itself
acknowledges, neither visual inspection of an unknown substance nor reference
to a search of a pharmaceutical database using the substance's characteristics
(such as its color or markings) would permit an expert to identify a substance
with scientific certainty.  Ante at note
27.  
      Thus, even if LaBelle reviewed Dunlap's
notes, LaBelle's opinion was based on her independent analysis of the raw GC-MS
data.  Excluding her testimony solely
because she reviewed those notes would impose an unnecessarily rigid rule --
one that would disqualify nearly all technical reviewers, even when their
conclusions rest on machine-generated results. 
Whether LaBelle relied primarily or exclusively on the GC-MS output, her
opinion reflected an independent judgment, not a surrogate endorsement of
Dunlap's conclusions.  It therefore did
not violate the confrontation clause.
      Even accepting the court's stringent rule,
which I do not, it does not follow that LaBelle's opinion relied on both the
GC-MS output and Dunlap's notes. 
LaBelle's testimony can reasonably be understood as resting solely on
the machine-generated data, which alone could support her conclusion to a
degree of scientific certainty.  Such
machine-generated data is not hearsay. 
See Souza, 494 Mass. at 718; Davis, 487 Mass. at 465.  See also Moon, 512 F.3d at 362; Washington,
498 F.3d at 230.   
      The court's interpretation of Smith
appears to suggest that only the analyst who performed the testing may testify
to raw data, because such data is typically derived from the execution of
"processes and protocols."  Ante
at     ("an expert's opinion based
on an absent analyst's test results that depends also on the truth of the
analyst's testimonial hearsay as to the processes and protocols she said she
followed to obtain those results is precluded by the confrontation
clause").  But that reading
unnecessarily departs from settled precedent. 
Had the Commonwealth introduced only the GC-MS results and called
LaBelle to interpret them live at trial, there would be no confrontation clause
violation.  See Moon, 512 F.3d at 362
("[H]ow could one cross-examine a gas chromatograph?"); State v.
Michaels, 219 N.J. 1, 44, cert. denied, 574 U.S. 1051 (2014) ("Clearly,
defendant could not cross-examine the machines themselves").  In substance, that is precisely what occurred
here.  
      This court has long held that the central concern
is not whether the expert "pushed the button" on the machine, but
whether the expert formed an independent opinion and can be meaningfully
cross-examined.  See Souza, 494 Mass. at
719 n.17; Greineder, 464 Mass. at 596-598; Barboza, 457 Mass. at 791-793.  The confrontation clause does not demand the
impossible -- cross-examination of a machine or every technician who performed
a mechanical step in a standardized process. 
See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n.1 (2009)
(government need not produce at trial "everyone who laid hands on the
evidence").
      What is constitutionally required is an
opportunity for meaningful cross-examination -- and that is precisely what the
defendant here received.  That is,
LaBelle possessed sufficient knowledge to permit meaningful
cross-examination.  Her background and
direct connection to the State police crime laboratory (crime lab), as well as
to the testing conducted in this case, provided a firm foundation for her
expert opinion on both the identity of the substance analyzed and the
laboratory's policies and procedures. 
LaBelle worked as an analyst at the laboratory for seven years before
becoming a supervisor, in which role she regularly conducted technical reviews
of other analysts' work.  As she
explained, a technical review involves verifying that each step of the
laboratory's protocol was followed and that the analyst's conclusions are
scientifically supported.
      In this case, LaBelle served as the
technical reviewer for the testing conducted by Dunlap.  This role and her background at the crime lab
gave her sufficient familiarity with the underlying procedures and results to
support her own independent opinion. 
Accordingly, the defendant had a meaningful opportunity to cross-examine
her regarding both the laboratory's protocols and the basis for her
conclusions.  See Sanchez, 476 Mass. at
732; Barbosa, 457 Mass. at 791.  Nothing
in the court's opinion prevents the Commonwealth from presenting substitute
expert testimony based on an independent review of raw data in this manner. 
      b. 
Dunlap's notes.  While LaBelle's
opinion was properly admitted, that does not resolve whether the admission of
her testimony concerning Dunlap's notes violated the defendant's confrontation
rights, as we must assess the admissibility of that testimony separately.  See Greineder, 464 Mass. at 584.  
      The court assumes that Dunlap's notes are
testimonial -- a questionable proposition, given the scant evidentiary
foundation.  The notes were not introduced
at trial, marked for identification, or included in the record on appeal.  Nor was Dunlap subject to voir dire
examination regarding why the notes were created.  Without knowing their content or context, it
is impossible to determine whether the notes were created primarily to
substitute for trial testimony, as required under the "primary
purpose" test.[40]  See Michigan v.
Bryant, 562 U.S. 344, 358-359 (2011); United States v. Seward, 135 F.4th 161,
169 (4th Cir. 2025) (court "could not hold that the challenged testimony
violated the [c]onfrontation [c]lause without determining . . . the 'primary
purpose' for which [absent analyst's] statements were made"); People vs.
Peterson, Mich. Ct. App., No. 364313, slip op. at 7 (July 25, 2024) (given uncertainties
in record, testimonial nature of evidence was not properly before court).  
      The court cites two reasons for finding
the notes testimonial.  First, it
emphasizes that Dunlap conducted her testing at the request of law
enforcement.  Ante at    .  See
Melendez-Diaz, 557 U.S. at 317.  While
that may be so, it does not follow that every document generated during such
testing is testimonial.  The record does
not show whether the notes themselves were created in response to a police
request or for some other purpose.  As
the United States Court of Appeals for the Fourth Circuit recognized,
"[a]lthough some statements produced by analysts are testimonial because
they serve 'an evidentiary purpose,' others -- such as 'lab records' written
'to comply with laboratory accreditation requirements or to facilitate internal
review and quality control' or 'notes . . . written simply as reminders to
self' -- serve no evidentiary purpose and are not testimonial."  Seward, 135 F.4th at 169, quoting Smith, 602
U.S. at 802.  
      Second, the court infers a "formal
nature" to Dunlap's notes based solely on Labelle's testimony that each
page bore Dunlap's initials and the laboratory's identification number.  Ante at    
(Dunlap's notes appeared, based on LaBelle's description, "to have
had at least some level of formality . . . further confirming the testimonial
nature of the notes").  See Bryant,
562 U.S. at 366.  See also Bullcoming,
564 U.S. at 671 (Sotomayor, J., concurring in part) ("a statement's
formality or informality can shed light on whether a particular statement has a
primary purpose of use at trial"). 
But formality alone does not render a statement testimonial.  See Bryant, supra ("Formality is not the
sole touchstone of our primary purpose inquiry . . .").  Documents may appear formal yet serve routine,
nonevidentiary purposes.  See
Melendez-Diaz, 557 U.S. at 324.  And
here, without the notes themselves, we cannot assess whether they include other
critical markers of formality, such as "a sworn [or] a certified
declaration of fact."  Williams, 567
U.S. at 111 (Thomas, J., concurring in the judgment).  In short, without access to the notes or
testimony from their author, we cannot meaningfully evaluate either their
primary purpose or their formality. 
      The court's conclusion that the notes were
testimonial is speculative and risks conflating ordinary laboratory
documentation with testimonial statements prepared for use at trial.  That approach risks unduly expanding the
scope of the confrontation clause and imposing constitutional barriers where
they are not justified, disregarding the practical realities of scientific
record-keeping.  It also goes further
than the Supreme Court itself was willing to go in Smith, where the Court
expressly declined to decide whether the records at issue were testimonial,
stating that the question was "not now fit for [the Court's]
resolution."  Smith, 602 U.S. at
801.  Again, the Court remanded the case
for further factual development, instructing the lower court to identify the
precise statements at issue and to "consider the range of recordkeeping
activities that lab analysts engage in." 
Id. at 802.  Here, by contrast,
the court reaches a constitutional conclusion without knowing the content,
context, or purpose of the notes.  
      3. 
Prejudice.  "Before a Federal
constitutional error can be held harmless, the court must be able to declare a
belief that it was harmless beyond a reasonable doubt" (alteration,
quotation, and citation omitted). 
Commonwealth v. Vasquez, 456 Mass. 350, 360 (2010).  Central to this inquiry is "whether the
error had, or might have had, an effect on the fact finder and whether the
error contributed to or might have contributed to the findings of guilty"
(alterations and citation omitted).  Id.  Importantly, "[t]he inquiry is not
whether, in a trial that occurred without the error, a guilty verdict would
surely have been rendered, but whether the guilty verdict actually rendered in
this trial was surely unattributable to the error" (quotation and citation
omitted).  Id. at 361.  The harmless error standard is "more
favorable to the defendant than the standards applicable to certain other
nonconstitutional errors," because "we presume prejudice when faced
with a constitutional violation." 
Commonwealth v. Yat Fung Ng, 491 Mass. 247, 256 n.13 (2023).  It is the Commonwealth's burden to overcome
this presumption.  Id.
      In evaluating whether a constitutional
error was harmless beyond a reasonable doubt, courts consider several factors,
including the importance of the improperly admitted testimony to the
prosecution's case, its relation to the defense theory, whether the defense or
the prosecution introduced the issue, the degree to which the testimony was
cumulative, its frequency of reference, the presence or absence of
corroborating or contradictory evidence, the scope of cross-examination, the
availability and effect of curative instructions, and the over-all strength of
the Commonwealth's case.  See Commonwealth
v. Ramsey, 466 Mass. 489, 494 (2013); Commonwealth v. DiBenedetto, 414 Mass.
37, 40 (1992), S.C., 427 Mass. 414 (1998).
      Here, although Dunlap's notes were not
introduced in evidence and the full context of their creation remains unknown,
I proceed -- consistent with our case law and the court's approach -- on the
assumption that they may have contained testimonial material.  Affording the defendant the benefit of the
doubt, if the notes were prepared primarily to establish or prove facts for use
at trial, they could qualify as testimonial under Bryant, 562 U.S. at 366.  As noted, because the notes were not marked
as exhibits and the circumstances surrounding their creation remain unexplored,
their precise nature cannot be definitively determined.  Even so, because the confrontation clause
inquiry turns on whether Labelle relied on testimonial statements, I proceed on
the assumption -- without definitive evidence -- that the notes included
testimonial material.  
      The key question, then, is whether the
erroneous admission of LaBelle's testimony referencing those notes was harmless
beyond a reasonable doubt.  On the one
hand, Labelle's ultimate opinion identifying the substance as Suboxone was
based on her independent review of the GC-MS data and was properly
admitted.  See Nardi, 452 Mass. at 395
("The most important medical evidence from the Commonwealth's point of
view was Dr. McDonough's opinion as to the cause of death.  That opinion was properly admitted in
evidence").  On the other hand,
Labelle's testimony concerning Dunlap's notes arguably "provided an
important factual basis that undergirded and supported [LaBelle's]
opinions."  Commonwealth v. Durand,
457 Mass. 574, 587 (2010), S.C., 475 Mass. 657 (2016), cert. denied, 583 U.S.
896 (2017).  While LaBelle testified that
the GC-MS data identified the presence of buprenorphine and naloxone, it was
her reference to Dunlap's notes that linked those findings to the specific item
seized from the defendant.  
      That link -- the bridge between the
machine-generated data and the physical evidence recovered from the defendant
-- was critical to the Commonwealth's case. 
Based on LaBelle's testimony, Dunlap's notes included information
pertinent to the substance's testing, from receipt of the item through
screening and confirmatory testing.  If
those notes were created for use in a future prosecution, and if Labelle's
testimony about them bridged the evidentiary gap between the analytical results
and the seized envelopes, then the confrontation clause violation went to the
heart of the prosecution's case.  See
Tassone, 468 Mass. at 403–404 (confrontation violation not harmless where
inadmissible expert testimony "connected the defendant to the eyeglasses
found at the scene").  Without that
bridge, the jury lacked the necessary context to conclude that the GC-MS
results pertained to the envelopes found on the defendant.  
      Moreover, although defense counsel
cross-examined LaBelle, the opportunity for meaningful confrontation was
limited.  She had no personal knowledge
of the collection, handling, or initial testing of the evidence and could not
speak to the integrity of those foundational processes.  See Commonwealth v. Jones, 472 Mass. 707, 716
(2015) ("Where the only answer that the expert can give to questions
concerning the chain of custody . . . is 'I don't know,' a defendant has been
deprived of the opportunity for meaningful cross-examination").
      The Commonwealth argues that the defendant
was not prejudiced because she did not dispute that the substance was Suboxone.
 Indeed, defense counsel, during closing
argument, referred to the substance as Suboxone and stated there was "[n]o
dispute about that."  But that
concession, which aligned with the defense theory that the defendant lacked
knowledge that the envelopes contained a controlled substance, did not relieve
the Commonwealth of its burden to prove each element of the offense beyond a
reasonable doubt.  See Ramsey, 466 Mass.
at 495.  That burden included proving the
identity of the substance.  See Vasquez,
456 Mass. at 361.
      This case closely parallels Vasquez, where
we held that the erroneous admission of drug certificates identifying a
controlled substance was not harmless -- despite defense counsel's concession
during closing argument as to the substance's identity.  Id. at 354-355, 366–367.  As we explained, "[t]he Commonwealth's
burden of proving every element of its case cannot be transferred to the
defendant because of his counsel's choice of defense."  Id. at 367-368.
      "The standard of harmlessness beyond
a reasonable doubt is a stringent one, for if 'loosely applied,' the concept of
harmless error 'can serve too readily as a bridge for a procession of mistakes
and injustices.'"  Vasquez, 456
Mass. at 361, quoting Commonwealth v. Sinnott, 399 Mass. 863, 872 (1987).  Keeping this standard in mind, and given the
uncertainty surrounding the content and context of Dunlap's notes, the
Commonwealth has not shown beyond a reasonable doubt that the admission of
Labelle's testimony referencing those notes -- assuming they were testimonial
-- was harmless.  I therefore
respectfully concur in the judgment.

footnotes

[1]
"Suboxone is the brand name of a medically based treatment product
containing buprenorphine and naloxone, prescribed for the treatment of opioid dependence."  Care & Protection of Zeb, 489 Mass. 783,
784 n.2 (2022).  Buprenorphine is a class
B controlled substance, but for purposes of this case, we refer to the controlled
substance as Suboxone in accordance with our prior case law.  See, e.g., Commonwealth v. Rodriguez, 484
Mass. 1047, 1047 (2020) (referring to Suboxone as class B substance).

[2] We
acknowledge the amicus briefs submitted by the New England Innocence Project
and the Innocence Project; and R. Michael Cassidy, Benjamin K. Golden, and
Elizabeth N. Mulvey.

[3] Because the
issue before us is the effect of Smith, 602 U.S. at 802-803, on the question
whether the substitute expert's testimony violated the defendant's rights under
the confrontation clause, we need not repeat the facts as they were set forth
in Commonwealth v. Gordon, 103 Mass. App. Ct. 1112 (2023) (unpublished),
vacated and remanded, 145 S. Ct. 412 (2024). 
The defendant raises additional issues unrelated to her right of
confrontation and has not identified how Smith affects the analysis of these
issues.  We therefore do not consider
them.  Instead, we focus on the facts and
procedural history pertinent to the constitutional question presented. 

[4] See note 1,
supra.

[5] "Most
controlled substances are subjected first to a field test for presumptive
identification.  This is followed by gas
chromatography-mass spectrometry (GC-MS), in which chromatography separates the
drug from any diluents or excipients, and then mass spectrometry is used to identify
the drug.  This is the near universal
test for identifying unknown substances." 

National Research
Council, Strengthening Forensic Science in the United States:  A Path Forward 134-135 (2009), cited in
Commonwealth v. Fernandez, 458 Mass. 137, 149 n.17 (2010).

[6] The record is
silent as to the reason for Dunlap's departure from the crime lab and provides
no insight into her availability at the time of trial.  See Commonwealth v. Rosado, 480 Mass. 540,
548-549 & n.8 (2018), citing Mass. G. Evid. § 804(a) (2018) (describing
criteria for assessing whether declarant is unavailable as witness, such as
invocation of privilege or declarant's persistent refusal to testify despite
court order).

[7] Although
sixty-one strips of an alleged controlled substance were available, only one
was tested.  The record does not explain
why another strip was not tested once the prosecutor determined to call a
substitute expert.  See Bullcoming v. New
Mexico, 564 U.S. 647, 666 (2011) (noting retesting would have avoided
prosecution's need for testimonial hearsay prohibited by confrontation clause).

[8] The jury also
found the defendant guilty of possession of a class B controlled substance with
intent to distribute in violation of G. L. c. 94C, § 32A (c), but the charge
was dismissed as duplicative by agreement. 
See Commonwealth v. Njuguna, 495 Mass. 770, 776-777 (2025), citing Morey
v. Commonwealth, 108 Mass. 433, 434 (1871). 
The defendant also pleaded guilty to conspiracy in violation of G. L. c.
94C, § 40, which was placed on file.

[9] We denied the
defendant's application for further appellate review.  See 493 Mass. 1105 (2024).

[10] The Sixth
Amendment provides, in relevant part, that "[i]n all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the
witnesses against him."  The bedrock
principle applies to both Federal and State prosecutions.  See Pointer v. Texas, 380 U.S. 400, 406
(1965).  
      The confrontation right is also protected
by art. 12 of the Massachusetts Declaration of Rights, which provides, in
relevant part, that a defendant "shall have a right . . . to meet the
witnesses against him face to face." 
We need not address in this case whether art. 12 provides broader
protections than the Sixth Amendment because we conclude that the defendant's
Sixth Amendment right of confrontation was violated.  Compare Commonwealth v. Nardi, 452 Mass. 379,
388 n.10 (2008), quoting Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1
(2006) ("the protection provided by art. 12 is coextensive with the
guarantees of the Sixth Amendment"), with Commonwealth v. Tassone, 468
Mass. 391, 402 (2014) (stating, prior to Smith, "[r]egardless of whether
the Supreme Court ultimately interprets the confrontation clause to permit the
admission of [expert opinion testimony from an expert who had no affiliation
with the laboratory that conducted the testing, which] effectively den[ies] the
defendant any meaningful opportunity for cross-examination, its admission in
our courts is barred by the right of confrontation in our common law of
evidence").

[11] Chief
Justice John Marshall said of the confrontation right:
"I know of
no principle in the preservation of which all are more concerned.  I know none, by undermining which, life,
liberty and property, might be more endangered. 
It is therefore incumbent on courts to be watchful of every inroad on a
principle so truly important."
United States v.
Burr, 25 F. Cas. 187, 193 (C.C.D. Va. 1807) (No. 14,694).

[12] Cf. 3 W.
Blackstone, Commentaries *373 ("This open examination of witnesses . . .
is much more conducive to the clearing up of truth . . .").

[13] The Supreme
Court also noted that scientific evidence may be subject to manipulation or
mistake, Melendez-Diaz, 557 U.S. at 318, and that "[c]onfrontation is
designed to weed out not only the fraudulent analyst, but the incompetent one
as well," id. at 319 (reviewing studies of exonerations based on
"discredited forensics" and "invalid forensic testimony"
[citation omitted]).

[14] In
Bullcoming, the Supreme Court "refused to accede to the idea that any old
analyst -- i.e., a substitute who had not taken part in the lab work -- would
do" to cure the confrontation clause's prohibition set forth in
Melendez-Diaz on the introduction of the absent analyst's testimonial
out-of-court statements.  Smith, 602 U.S.
at 798.  Writing separately, Justice
Sotomayor emphasized the limits of the Supreme Court's holding in Bullcoming;
she observed that "this is not a case in which the person testifying is a
supervisor, reviewer, or someone else with a personal, albeit limited,
connection to the scientific test at issue."  Bullcoming, 564 U.S. at 672-673 (Sotomayor, J.,
concurring in part) (while not "address[ing] what degree of involvement is
sufficient," noting that "[i]t would be a different case if, for
example, a supervisor who observed an analyst conducting a test testified about
the results or a report about such results").

[15] While the
State expert impliedly referred to the absent analyst's testing results in the
course of providing her own opinion, the absent analyst's report, setting forth
the analyst's results, was not itself introduced in evidence.  Williams, 567 U.S. at 79.

[16] The fifth
justice, Justice Thomas, disagreed with that the plurality's reasoning but
joined the plurality on the alternative ground that the analyst's report and
DNA profile results "lack[ed] the solemnity of an affidavit or
deposition" and thus were not testimonial. 
Williams, 567 U.S. at 111 (Thomas, J., concurring in the judgment).

[17] Consistent
with the Supreme Court's formulation, we have concluded that an absent
analyst's out-of-court statements are testimonial where "a reasonable
[analyst] would anticipate that her findings would be available for use at
trial."  Commonwealth v. Barbosa,
457 Mass. 773, 784 (2010), cert. denied, 563 U.S. 990 (2011).  See Commonwealth v. Greineder, 464 Mass. 580,
594 n.15, cert. denied, 571 U.S. 865 (2013) (defining "testimonial"
as where "a reasonable person in [the nontestifying analyst's] position
would anticipate her findings and conclusions being used against the accused in
investigating and prosecuting a crime" [citation omitted]); Commonwealth
v. Avila, 454 Mass. 744, 763 n.20 (2009), quoting Nardi, 452 Mass. at 394
(hearsay was testimonial because "a reasonable person in [the
nontestifying examiner's] position would anticipate his [findings and conclusions]
being used against the accused in investigating and prosecuting a crime").

[18] By statute,
the crime lab's sole function is the production of such evidence.  In particular, G. L. c. 22C, § 39 (a),
provides in relevant part:
"The
department shall, free of charge, or the University of Massachusetts Medical
School shall . . . make a chemical analysis of any narcotic drug . . . or
chemical submitted to it by police authorities, . . . provided, however, that
neither the department nor the medical school shall conduct such analysis
unless it is satisfied that the analysis submitted to it is to be used in
connection with the enforcement of law" (emphasis added).

[19] Because
Dunlap's notes are not in the record, we necessarily rely on LaBelle's
testimony describing them.  LaBelle's
testimony described the notes' contents as well as the context in which they
were made.  Contrary to the concurrence's
admonition, post at    , these details
suffice to conclude that Dunlap's statements, made at the behest of law
enforcement to prove that the strips contained a controlled substance, an
element of the charged offense, were testimonial.

[20] The
concurrence suggests that our conclusion that Dunlap's notes were testimonial
"risks conflating ordinary laboratory documentation with testimonial
statements prepared for use at trial." 
Post at    .  The alarm is unwarranted.  We conclude only that Dunlap's statements,
documenting the scientific steps she took to perform the chemical analysis she
was asked to conduct by law enforcement officials to prove an element of the
crime with which the defendant was charged, and which bore some indicia of
formality, were testimonial.  Contrast
Commonwealth v. Zeininger, 459 Mass. 775, 788-789 & n.18, cert. denied, 565
U.S. 967 (2011) (differentiating technician certifying breathalyzer machine
from chemist authoring certificates of drug analysis because technician has
"no particular prosecutorial use in mind," and concluding that
documentation for calibration of machine is not testimonial [citation
omitted]); Commonwealth v. Bloom, 2025 PA Super 143 (2025), citing Smith, 602
U.S. at 802 (toxicology report not testimonial where report ordered from
private laboratory to determine cause of death "was not drafted for the
primary purpose of being used in court," "there was nothing
indicating the blood samples were 'seized evidence,'" and report lacked
"procedural formalities").

[21] The
concurrence reads Smith to concern only the question whether when an expert's
opinion is based on an absent analyst's out-of-court statements, those
statements are hearsay.  Post at    . 
This limited view fails to account for the Supreme Court's further
discussion, detailed supra, regarding the confrontation clause violation
attendant to a substitute expert's "independent" opinion based on an
absent analyst's testimonial hearsay and testing data.  See Smith, 602 U.S. at 798-799.

[22] The Fourth
Circuit continued, "The obvious implication -- indeed, the only way the testimony
makes sense -- is that the [substitute] expert was representing that the
non-testifying analyst who ran the underlying tests in fact followed the
procedures the [substitute] expert had just described."  Seward, 135 F.4th at 168.

[23] Other courts
examining the permissibility of an independent expert opinion founded on an
absent analyst's testimonial hearsay have come to the same conclusion --
namely, that such opinion testimony violates the confrontation clause.  See People vs. Soliz, Cal. Ct. App., No.
B333746 (Nov. 18, 2024) ("To the extent [the technical and administrative
reviewer] sought to offer an 'independent opinion' based on his review of [the
nontestifying analyst's] work, Smith explains the [c]onfrontation [c]lause can
still be implicated"); State vs. Miller, Minn. Ct. App., No. A24-0205
(Feb. 24, 2025) (confrontation clause violated by admission of toxicology
opinion of substitute expert who independently reviewed test results of absent
analysts); State v. Clark, 296 N.C. App. 718, 724 (2024) (substitute expert's
independent opinion violated confrontation clause even though expert reviewed
nontestifying expert's report and testing results of chemical analysis); State
v. Hale, 2024-Ohio-5579, ¶¶ 60-73 (experts who relied on data generated by
nontestifying technicians and analysts "provided to them . . . in a series
of out-of-court statements" as basis for opinions "implicitly offered
those out-of-court statements into evidence," and because statements were
testimonial, defendant "had a constitutional right to be confronted with
those [nontestifying] witnesses, not merely the experts who generated the
ultimate conclusions"); State v. Hall-Haught, 4 Wash.3d 810, 824-825
(2025) (substitute expert, even if absent analyst's supervisor who reviewed
analyst's steps and signed toxicology report, could not testify, consistent
with Smith, to "independent opinion" in sole reliance on absent
analyst's factual statements and data from testing results).  See also United States vs. Pascoe, U.S. Dist.
Ct., No. 3:22-cr-88-DJH (W.D. Ky. July 31, 2024) ("Expert testimony that
relies upon or repeats the findings of [testimonial hearsay] must . . . be
excluded absent in-court testimony and cross-examination of the [declarant] or
the requisite showings of unavailability and prior confrontation").

[24] The
concurrence instead relies on four other cases from intermediate courts of
appeal, three of which are unpublished and none of which squarely addresses the
holding in Smith regarding the confrontation clause violation that occurs when
a substitute expert's opinion is based on raw data and depends on` the absent
analyst's testimonial hearsay.  In some
of those cases, the defendant (unlike here) waived the confrontation clause
violation.  See, e.g., State vs. Shea,
Minn. Ct. App., No. A23-1523, slip. op. at 8 (Sept. 9, 2024) (addressing
question whether conviction was unfair given defendant's failure to object to
admission of absent analyst's reports, where "[h]ad [the defendant] objected
or moved to exclude that evidence, the [S]tate likely could have remedied any
[c]onfrontation [c]lause or hearsay concerns by having [the absent analyst]
testify"); Gourley v. State, 710 S.W.3d 368, 375 (Tex. Ct. App. 2025).  One case determined there was no confrontation
clause violation on the ground that in that case (unlike here) the absent
analyst's notes and report were not conveyed to the jury.  See Gourley, supra at 378 & n.3.  Other cases fail to comprehend that the
substitute expert's opinion in Smith was based on raw data and depended on the
absent analyst's notes and report. 
Compare State vs. Kellum, N.M. Ct. App., No. A-1-CA-41306, slip op. at
5-6 (Apr. 23, 2025), and Gourley, supra, with Brief for Respondent at 1, Smith,
602 U.S. 779 (noting that one source of expert's opinion was "graphs
reflecting machine-generated raw data" from nontestifying analyst's GC-MS
testing), and Reply Brief for Petitioner at 16 n.*, Smith, supra ("[T]he
GC-MS graphs appended to [the nontestifying analyst's] notes are not statements
themselves.  But [the analyst's]
notations in the graphs that identify the samples she tested and the remarks in
her notes describing what she did and observed are").  In Kellum, after misunderstanding the record
in Smith, the court also acknowledged that it was without authority to change
the State's highest court's precedent even if Smith now called it into
question.  Kellum, supra at 8 n.1.
      Finally, in Dunlap vs. State, Md. App.
Ct., No. 969, Sept. Term, 2023, slip op. at 17-18, 25 (Apr. 8, 2025), the
Appellate Court of Maryland ultimately determined that an absent technician's
report, stating that he sent the defendant's cell phone to a different
laboratory to determine the password, received it back from the laboratory, uploaded
the cell phone's data using software, and put the data in a particular
password-protected server location, effectively "was more or less a link
in the chain of custody," which the Supreme Court has noted goes to the
weight of the evidence.  See Melendez-Diaz,
557 U.S. at 311 n.1.  To the extent
Dunlap suggests that a technical reviewer's opinion based on raw data and
dependent on an absent analyst's testimonial hearsay that the analyst followed
proper protocols and procedures comports with the confrontation clause, we
decline to adopt its misreading of the scope of the Supreme Court's decision in
Smith.  Compare Dunlap, supra at 23,
citing State v. Miller, 475 Md. 263, 290-293 (2021), with Smith, 602 U.S.
798-799.  See also Smith, supra at 819
(Alito, J., concurring in the judgment) (substitute expert "did not have
personal knowledge of any of [the] facts [stated in the absent analyst's
reports regarding her testing], and it is unclear what 'reliable' scientific
'methods' could lead him to intuit their truth from [the absent analyst's]
records").

[25] Contrary to
the concurrence's suggestion, we do not hold that an expert who reviews
testimonial hearsay, even cursorily, cannot testify to the expert's
interpretation of raw data.  We conclude
only that, after Smith, a substitute expert's opinion that depends on the
testimonial hearsay of an absent analyst violates the confrontation clause;
thus, where an expert's opinion based in part on raw data is not independent of
the truth of the absent analyst's statements regarding the protocols and
procedures the analyst said she followed, the true witness against the accused
is the analyst insofar as the expert's opinion depends on the truth of the
analyst's testimonial hearsay.

[26] This case,
like Smith, involves one analyst who herself performed all the steps in the
chemical analysis and a substitute expert whose opinion depended upon the truth
of the absent analyst's testimonial hearsay; even LaBelle's opinion based on
the GC-MS output depended on Dunlap's testimonial hearsay as to the procedures
and protocols she followed.  The present
case does not involve an expert who "builds on" the absent analyst's
work, a scenario that the Supreme Court did not further define.  Smith, 602 U.S. at 798-799.  And this case does not present the practical
challenges that may arise where an expert relies on multiple analysts who
participate in testing or on multiple sources only some of which comprise
testimonial hearsay, for which the Supreme Court has not yet provided
additional guidance.  See Williams, 567
U.S. at 86 (Breyer, J., concurring) (lamenting decision not to invite briefing
on issue).  Nor does this case involve an
expert who relies on laboratory technicians to perform purely
"ministerial" tasks under the expert's direct supervision.  See generally D.H. Kaye, D.E. Bernstein, A.G.
Ferguson, M. Wittlin, & J.L. Mnookin, The New Wigmore:  A Treatise on Evidence § 5.5.2, at 297-299
(3d ed. 2021).  We leave for another day
these other scenarios, including the question whether the absence of such
aforementioned technicians' live testimony goes to the weight (as opposed to
the admissibility) of the expert's opinion. 
See Melendez-Diaz, 557 U.S. at 311 n.1 (acknowledging that not all
persons who have "laid hands on the evidence must be called," that
gaps in chain go to "weight" of evidence, and that those who do
testify must do so live).

[27] The database
printout does not itself present a confrontation clause problem because it is
not testimonial as any statements in the database from which the printout was
created were not given for purposes of creating testimony for use at trial
against the defendant.  See discussion
supra.  
      In any event, as described in LaBelle's
testimony, the use of the database was only a preliminary step before Dunlap
conducted the confirmatory test central to the identification of the controlled
substance.  Alone, as LaBelle
acknowledged when she described the need for a confirmatory test, it did not
provide a scientifically sound methodology for determining the substance on the
strip.  See United States Department of
Justice, Drug Enforcement Administration, Scientific Working Group for the
Analysis of Seized Drugs (SWGDRUG) Recommendations, at 17-20 & n.4 (June
27, 2024) (placing pharmaceutical identifiers in lowest of three categories of
identification techniques, among those that "achieve a low level of
selectivity but provide general or class information," because of
"potential for counterfeits").

[28] The
concurrence states that the jury could rely on this isolated aspect of
LaBelle's testimony, thereby (according to the concurrence) avoiding the
confrontation clause violation altogether. 
Post at    .  But, as discussed supra, the Commonwealth
bears the burden to prove its case without violating the confrontation
clause.  In assessing whether the
Commonwealth has met that burden, we do not view the evidence in the light most
favorable to the Commonwealth.  Instead,
the Commonwealth must show that LaBelle's opinion did not violate the
confrontation clause.  See, e.g.,
Bullcoming, 564 U.S. at 666.  And, as the
Commonwealth concedes, LaBelle's opinion depended on Dunlap's notes; thus, even
her view of the raw data was not independent of Dunlap's testimonial hearsay as
to the procedures and protocols Dunlap claimed to have followed. 

[29] The
concurrence misapprehends our holding, asserting that we conclude that a
qualified expert may not decipher for the jury what a graph of a GC-MS output
signifies.  Here, LaBelle's opinion was
not based on raw data alone; her opinion as to the GC-MS output depended on the
truth of Dunlap's testimonial hearsay, as LaBelle herself testified when
expressly asked by the prosecutor whether her opinion was based on the raw data
alone, as the Commonwealth concedes on appeal, and as the concurrence
ultimately acknowledges in concluding that LaBelle's testimony was not harmless
beyond a reasonable doubt.  See discussion
supra.

[30] See generally
H.M. McNair, J.M. Miller, & N.H. Snow, Basic Gas Chromatography 104 (3d ed.
2019) ("Errors that occur in any step can invalidate the best
chromatographic analysis, so attention must be paid to all steps. . . .  With major advances in instrumentation and
data analysis in the past [forty] years, the major sources of error in [gas
chromatography]-based methods are usually sampling and sample preparation . .
.").

[31] Facts or
data are "independently admissible" if they "would potentially
be admissible through appropriate witnesses."  See Commonwealth v. Markvart, 437 Mass. 331,
337-338 (2002).  See also Nardi, 452
Mass. at 389 n.11 (contents of nontestifying expert's autopsy report were
permissible basis for testifying expert's opinion because statements in report
would be admissible if nontestifying expert testified).

[32] The
reasonableness of LaBelle's reliance on Dunlap's notes in forming her opinion
was supported by LaBelle's testimony that she relied on Dunlap's notes in conducting
a technical and administrative review of Dunlap's work, concluding that it
conformed with the crime lab's policies and procedures.

[33] The
Commonwealth mistakenly asserts that the defendant did not preserve his
objection to the constitutional violation. 
As discussed supra, trial counsel objected at the close of LaBelle's
testimony and moved to strike the testimony on the ground that it violated the
defendant's right to confrontation.  In
fact, contrary to the Commonwealth's assertion, the trial judge expressly noted
that her "rights are saved on that issue."  Aside from its argument erroneously applying
the standard for unpreserved errors, the Commonwealth otherwise does not
contend that the error in admitting Dunlap's testimonial hearsay was harmless
beyond a reasonable doubt.

[34] A new trial
is the appropriate remedy where a conviction is set aside due to a procedural
error.  See Commonwealth v. Crowder, 495
Mass. 552, 559-560 (2025), petition for cert. filed, U.S. Supreme Ct., No.
24-7498 (June 25, 2025), citing Lockhart v. Nelson, 488 U.S. 33, 38
(1988).  Because the right of
confrontation is "a procedural rather than a substantive guarantee,"
a violation of that right will accordingly result in a new trial.  Crawford, 541 U.S. at 61.

[35] While, as in
the present case, a gas chromatography–mass spectrometry test was performed in
Smith, 602 U.S. at 791, the decision features no discussion of the extent to
which the expert relied on any data derived from that test in forming his
opinion.  Moreover, even the petitioner
in Smith conceded that it would have been proper for the expert to
"testify generally that certain data he reviewed in the abstract reflected
the presence of illicit drugs without revealing [the underlying analyst's]
statements about what she did to generate those data."  See Reply Brief for the Petitioner at 18,
Smith 602 U.S. 779.

[36] Indeed, the
holding in Smith aligns with this court's jurisprudence.  See, e.g., Greineder, 464 Mass. at 583-584
(nontestifying analyst's out-of-court statement, even when used as basis of
testifying expert's opinion, "is offered for its truth and, therefore, is
hearsay"); Commonwealth v. Nardi, 452 Mass. 379, 391-394 (2008).  In Nardi, the court held that a pathologist
could testify as to his opinion about the cause of a victim's death, where the
opinion was based in part on his review of materials generated by a
nontestifying medical examiner, including an autopsy report, notes, diagrams,
photographs, tissue slides, and a toxicology report.  Id. at 383, 388-390.  In so holding, the court relied on Department
of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986), where we held that an
expert is permitted to "base an opinion on facts or data not in evidence
if the facts or data are independently admissible and are a permissible basis
for an expert to consider in formulating an opinion."  The pathologist could not, however, testify
on direct examination as to any findings or conclusions within the autopsy
report, which were testimonial hearsay and therefore inadmissible.  Nardi, supra at 391-394.  That holding is harmonious with the Supreme
Court's subsequent conclusion that an absent analyst's statements conveyed in
support of a testifying expert's opinion constitute hearsay.  See Smith, 602 U.S. at 783.

[37] The court
asserts that none of these cases "squarely addresses the holding in
Smith."  Ante at note 24.  However, each case expressly acknowledges
Smith and explains why it does not apply. 
See Gourley 710 S.W.3d at 378 n.3 (distinguishing Smith where expert
"formed his own conclusions" based on independent review of "raw
data" generated by underlying analyst); Shea, Minn. Ct. App., No.
A23-1523, slip op. at 5 ("unlike the expert's testimony in Smith, [here
the expert's] testimony was premised upon a machine-generated DNA
profile," which is not hearsay); Kellum, N.M. Ct. App., No. A-1-CA-41306,
slip op. at 7 ("To the extent that Smith changed the applicable
[c]onfrontation [c]lause analysis, it does not affect [the court's holding that
raw data produced by an underlying analyst is not testimonial] because, as we
have said, raw data was not relied on by the testifying expert in
Smith").  

[38] The court
further asserts that these decisions fail to account for the fact that
"the substitute expert's opinion in Smith was based on raw data and
depended on the absent analyst's notes and report."  Ante at note 24.  The implication appears to be that any expert
opinion based on a combination of raw data and testimonial hearsay is per se
inadmissible under Smith.  But again,
that is not what Smith holds.  Smith
addresses the admissibility of the basis for an expert's opinion, not the
opinion itself.
      Moreover, the court's assertion that the
Smith expert reviewed "raw data" rests solely on the respondent's
brief, which states only that one source of the expert's opinion was
"graphs reflecting machine-generated raw data."  Brief for Respondent at 1, Smith, 602 U.S.
779.  It remains unclear, however, (1)
whether that data was first transcribed -- perhaps selectively or inaccurately
-- by the absent analyst into notes or a report, and, if so, (2) whether the
substitute expert reviewed the transcription rather than the machine-generated
data itself.  Absent that distinction,
the court's reliance on the respondent's brief in Smith is unfounded; the
substitute expert's opinion may have been based on information subject to human
intervention.  More fundamentally, Smith
says nothing about whether the presence of raw data affects the admissibility
of a substitute expert's testimony.  The
Supreme Court's opinion cannot be read to support the court's inference.  

[39] The court
dismisses Dunlap vs. State on the ground that the expert's testimony there
concerned chain of custody information. 
Ante at note 24.  The Appellate
Court of Maryland held in Dunlap that Smith did not abrogate Maryland precedent
permitting a technical reviewer's independent opinion to substitute for the
original analyst's.  Dunlap, Md. App.
Ct., No. 969, slip op. at 23.  That
holding does not turn on whether the testimony involved chain of custody
matters.  Indeed, Dunlap relied on State
v. Miller, 475 Md. 263, 284 (2021), which concerned the analysis of
deoxyribonucleic acid evidence, not chain of custody issues.  

[40] The court's
assumption is also problematic given the uncertainty over whether Dunlap's
notes even qualify as hearsay.  If Dunlap
prepared the notes solely as a personal aid to refresh her memory in
preparation for testifying -- rather than to communicate information to others
-- they may lack communicative intent and thus fall outside the definition of
hearsay.  See Mass. G. Evid. § 801(a)
(2025) ("statement" under § 801[a] requires communicative intent);
United States v. Seward, 135 F.4th 161, 169 (4th Cir. 2025) (notes
"written simply as reminders to self" may be nontestimonial [citation
omitted]).